[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 477 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 478 
On September 12, 2001, Robert M. Davant, Jr., as trustee of the Farrell 1986 Trust ("the Trust"), sued United Land Corporation ("United Land") and Jim Walter Resources, Inc. ("JWR"), in the Tuscaloosa Circuit Court alleging breach of contract, fraudulent suppression, and unjust enrichment, and seeking an accounting. In addition to monetary damages, the Trust sought to rescind and cancel a coal-mining lease executed August 14, 1984, between Davant, as lessor, and United States Pipe and Foundry Company ("U.S. Pipe"), as lessee ("the lease"). The Trust appeals from summary judgments entered in favor of the defendants. We affirm.
The lease authorized U.S. Pipe to mine underground coal from Davant's undivided one-half interest in an 11.75-acre parcel and a contiguous 40-acre parcel in Tuscaloosa County. Subsequently, Davant created the Trust and conveyed his interest in the land to the Trust on December 31, 1987. The Trust alleged in its complaint that "[p]rior to 1988 [United Land] was known as United States Pipe and Foundry Company," and that the other undivided one-half interest in the leased premises was owned by the Hortense E. Davant Trust, which separately leased its interest to U.S. Pipe. Although not evident from the record, the involvement of JWR is stated in its and United Land's joint brief to be that "JWR is a corporate affiliate of United [Land] and is the company that actually mined coal from the Property." (Brief of Appellees, pp. 2 — 3 n. 1.) The complaint stated that the August 14, 1984, lease required the lessee to pay the lessor a three and one-half percent royalty for all coal mined; the royalty payments were due by the 20th day of each month and were to be accompanied by a reconciliation statement showing the exact amount of coal removed during the preceding month. The Trust averred that, although Davant had received three royalty payments through January 1986, after that neither he nor the Trust had received royalty payments or reconciliation statements and that Davant had assumed that mining operations had ceased on the property. The Trust asserted that it now had reason to believe that coal had been mined "from 1985 to the present" and that "[b]y failing to pay all of the royalties due under the Lease, the defendants have breached the Lease." The complaint asserted other instances of breach relating to the alleged failure or refusal of the defendants to provide information required to be provided under the terms of the lease.
On October 10, 2001, the defendants filed a motion to dismiss the action pursuant to Rule 12(b)(6), Ala. R. Civ. P., or, in the alternative, for a summary judgment pursuant to Rule 56, Ala. R. Civ. P. The summary-judgment motion was granted as to all of the claims except the fraudulent-suppression *Page 479 
claim. The defendants subsequently filed a second summary-judgment motion directed toward the fraudulent-suppression claim; that motion was granted, and the action was dismissed with prejudice.
The defendants asserted in their motion to dismiss or for a summary judgment that the action represented an effort by the Trust to relitigate claims previously litigated in a federal district court action in Texas and that, because the last coal had been mined from the property in 1989, all claims asserted by the Trust were barred by applicable statutes of limitation, including the six-year statute governing breach-of-contract claims. In support of the motion, the defendants attached a copy of the complaint filed in the Texas action, a copy of an affidavit filed in that action, and copies of the order and the judgment in that action. Those materials reflected that Davant had sued "United States Pipe and Foundry Company" on January 27, 2000, asserting that it had breached the lease by failing "to pay Plaintiff a royalty for all the coal that Defendant has mined from Plaintiff's property." Subsequently, the original and then trustee of the Farrell 1986 Trust was added as a plaintiff, the court noting that Davant had "transferred his 50 percent mineral interest regarding the August 14, 1984, mining lease to the Farrell Trust." (Davant later became the trustee of the Trust, at a time he could place during his October 25, 2002, deposition only as having been "within five years" of the deposition.)
U.S. Pipe filed a motion for a summary judgment in the Texas action, supported by the affidavit of Charles A. Dixon, vice president of mining engineering for JWR, stating that he had been its vice president of mining engineering between 1984 and 1989 and that he had personal knowledge of U.S. Pipe's mining of coal from the acreage in question. The affidavit stated further:
 "In 1984, Davant represented that he owned a 50% interest in the mineral rights to 51.75 acres in Section 3 of Township 20 in Tuscaloosa County, Alabama. On August 14, 1984, Davant leased this land to United States Pipe and Foundry Company for coal mining. "Between 1975[sic] and 1989, United States Pipe and Foundry Company mined coal from this acreage in Section 3 and made royalty payments to Davant. "United States Pipe and Foundry Company completed mining activities on this property in 1989. United States Pipe and Foundry Company has not removed any coal from this property since 1989. "If there was any mispayment of royalties to plaintiffs, which United States Pipe and Foundry Company denies, the error occurred in or before 1989.
 "Throughout the time period involved, 1984-1989, the tonnage of coal mined by United States Pipe and Foundry Company was subject to review by Robert Davant or his representative or agent. The lease specifically authorized Davant and his engineers, agents, or attorneys, to examine and survey the mined premises and; to examine and verify United States Pipe and Foundry's books, accounts, sales records, maps and plans to determine the amount of coal taken from the premises and to verify the selling price."
On July 13, 2000, the federal district court entered a summary judgment for U.S. Pipe, specifically finding and declaring as follows:
 "The undisputed facts in the record of this case establish that on August 14, 1984, the plaintiff Robert M. Davant, Jr., executed a mining lease with United States Pipe and Foundry Company wherein Mr. Davant retained a 50 percent *Page 480 
mineral interest. Thereafter or at the same time, Mr. Davant entered into a lease agreement concerning the same property with the Estate of Hortense Davant (Mr. Davant was a beneficiary of this estate). On December 31, 1987, Mr. Davant transferred his 50 percent mineral interest regarding the August 14, 1984, mining lease to the Farrell Trust.
 "United States Pipe and Foundry Company began mining coal under the August 14, 1984, lease in 1985, but completed all mining operations and vacated the property in 1989.
 "The August 14, 1984, lease was for a twenty-year term and expires on August 14, 2004. It provided for royalty payments to be paid on the 20th day of each month with an accompanying reconciliation statement showing the exact amount of coal removed in the preceding month. The lease also expressly included when no coal was mined and/or sold, there was no necessity for the presentation of a reconciliation statement. The plaintiffs received no royalty payments nor reconciliation statements after January 1986. At all times, the August 14, 1984, lease specifically authorized plaintiffs or their agents to examine and survey the mined premises and to examine and verify United States Pipe and Foundry Company's books, accounts, sale records, maps, and plans to confirm the accuracy of the royalty payments.
 "The plaintiffs allege that in 1999 the Hortense E. Davant Trust was scheduled to terminate and the plaintiff Davant became interested in purchasing the trust's interest in the land in question. During the examination of this interest, the plaintiff Davant and, subsequently, the Trustee of the Farrell Trust concluded that they had not receive[d] appropriate payments prior to United States Pipe and Foundry Company's completion of mining activities in 1989.
 "United States Pipe and Foundry Company filed this motion for summary judgment based upon the applicable statute of limitations. The plaintiffs allege that the `discovery rule' is applicable and tolls the statute of limitations and that summary judgment is not appropriate. They primarily rely on Houston Endowment, Inc. v. Atlantic Richfield Co., 972 S.W.2d 156 [(Tex.Ct.App. 1998)]. The defendant United States Pipe and Foundry Company relies upon HECI Exploration Co. v. Neel, 982 S.W.2d 881 (Tex. 1998). The undisputed factual recitals in this order as well as the Texas Supreme Court case persuade the undersigned the motion for summary judgment based on limitations is good. Since January of 1989 (according to the defendant's pleadings) or January of 1986 (according to the plaintiffs' pleadings), no royalty payments or reconciliation statements have issued and mining operations had completely stopped with the vacation of the premises by 1989. The plaintiffs had contractual rights to discover any inappropriate conduct under the contracts and obviously the contracts would have been breached by January 1989, if breached at all."
Davant and the Trust did not appeal the summary judgment.
On November 16, 2001, the Trust filed in the Tuscaloosa Circuit Court action its response to the defendants motion to dismiss or for a summary judgment, arguing with respect to the summary-judgment aspect of the motion that, among other things, the motion was deficient because it did not include a narrative statement of undisputed material facts as required by Rule 56(c)(1) and that none of the claims were barred by the expiration of a statute of limitation. Specifically, the Trust argued that the lease remained in effect and that the Trust was not alleging "a breach dating *Page 481 
back to the 1980s," but rather was alleging "among other things a continuing breach that is ongoing as of the present date, as well as a breach that occurred on or about August 4, 2001," relating to a written request made that date by the Trust to the defendants for access to information regarding coal mining conducted pursuant to the lease.
The Trust did not in its response object to or move to strike any of the exhibits to the defendants' motion, did not seek a continuance of the hearing scheduled on the motion for November 20 and did not suggest that any discovery was needed as to the statute-of-limitation issue. Also on November 16, the defendants filed a five-page "submission" in support of their motion. Although untimely, given the scheduled November 20 hearing date, the submission amounted to nothing more than a "rehash" of the matters already presented by the motion to dismiss or for a summary judgment. No evidentiary materials were offered in connection with this submission, no new facts were presented, and no new defenses or legal arguments were advanced. Rather, as pertinent to the subsequently entered summary judgment, the submission simply reiterated the defendants' contention that all claims asserted by the Trust were barred by the expiration of the applicable statutes of limitation. The trial judge conducted the hearing as scheduled and on November 28 entered an order finding that
 "[t]here is no dispute of a material fact. . . . The causes of action pled in the complaint are all based on the mining operations which ceased in 1989. The applicable statute of limitations and laches bar recovery or relief under any cause of action except the fraudulent suppression claim. At this point, considering the evidence before the court or lack thereof, there is a factual dispute as to when the plaintiff should have discovered the facts that would have put him on notice of the fraud claim."
Consequently, the trial judge entered summary judgment against the Trust "on all claims except the fraudulent suppression claim."
 I. Sufficiency of First Motion for Summary Judgment
The Trust argues on appeal that the trial court erred in entertaining the summary-judgment motion because it did not contain a narrative summary of undisputed material facts, as required by Rule 56(c)(1), Ala. R. Civ. P., and because the defendants' November 16 submission in support of the motion was untimely. We have already stated that the November 16 submission was untimely and was therefore due to be disregarded by the trial court; however, nothing in the record shows that the trial court considered it.
Concerning the requirement that a summary-judgment motion contain a narrative summary of undisputed material facts, Rule 56(c)(1) states:
 "(1) Form of Motion and Statement in Opposition Thereto. The motion shall be supported by a narrative summary of what the movant contends to be the undisputed material facts; that narrative summary may be set forth in the motion or may be attached as an exhibit. The narrative summary shall be supported by specific references to pleadings, portions of discovery materials, or affidavits and may include citations to legal authority. Any supporting documents that are not on file shall be attached as exhibits. If the opposing party contends that material facts are in dispute, that party shall file and serve a statement in opposition supported in the same manner as is provided herein for a summary of undisputed material facts." *Page 482 
In its response to the motion, the Trust took the position that, because the summary-judgment motion did not contain a formally identified narrative summary, it was due to be denied. In its brief to this Court, the Trust argues that the trial court should have treated the motion exclusively as one for a dismissal, and "refrain[ed] from considering the Defendants' Motion in the Alternative, until [the Trust] had been given an opportunity to develop and present its own evidence in opposition." The Trust asserts that it argued to the trial judge at the November 20 hearing that because the defendants' "submission in support" was untimely the Trust intended to address its arguments only to the motion to dismiss, requesting that before the court "converted" the motion to dismiss into one for a summary judgment, the Trust be given an opportunity to submit evidentiary materials in opposition. The Trust complains that it was never informed that the trial court was going to treat the motion to dismiss as one for summary judgment and that it was therefore deprived of any opportunity to respond to the defendants' evidentiary material before the trial court entered the partial summary judgment on November 28, 2001.
As support for those assertions, the Trust cites only its "Motion to Reconsider Partial Grant of Summary Judgment" filed January 29, 2002, and its April 2, 2002, reply to the defendants' response to its motion to reconsider. The motion to reconsider was not heard by the trial judge who entered the partial summary judgment, the Trust having successfully sought the recusal of the initial trial judge. The trial judge hearing the motion to reconsider, therefore, could not take judicial notice of anything supposedly stated at the hearing on the summary-judgment motion. At any rate, the Trust simply argued in its motion to reconsider that because the defendants' untimely submission in support of the summary-judgment motion contained the first expressly identified statement of undisputed facts, "the defendants' statement of fact was not timely tendered and should not have been considered by the Court," and that had the submission been timely the Trust "would have filed a Rule 56(f) affidavit in response, averring to the need for further discovery in order to oppose the `facts' proffered by the defendants." In its April 2, 2002, reply, the Trust expanded this argument as follows:
 "The defendants also make the false and misleading assertion that their motion for summary judgment was fully argued before the [the initial trial judge]. In fact, what was argued before [initial trial judge] was the defendants' motion to dismiss. The [Trust] informed the Court at the November 28, 2001 hearing that in light of the fact that the defendants' supporting materials had not been timely filed as required by Alabama law, the [Trust] intended to argue the Motion as a motion to dismiss. The [Trust] specifically requested that before the Court convert the motion to dismiss into a motion for summary judgment that the [Trust] be informed of the Court's intention and that the [Trust] be given a reasonable opportunity to submit evidentiary materials in opposition. The Court, however, never informed the [Trust] that it was treating the Motion as one for summary judgment, and did not give the [Trust] any opportunity to respond to the defendants' untimely-filed evidentiary material prior to entering its Order. As a consequence, the [Trust] has not been heard in opposition to the defendants' motion for summary judgment, and the impression created by the defendants that the [initial trial judge] heard `extended arguments' on the same is incorrect." *Page 483 
Even if these assertions were sufficient, in the abstract, to establish error on the part of the initial trial judge, we could not base a reversal on them because they are unsupported by the record. That is not to impugn in any way the integrity or credibility of counsel for the Trust; it is simply to acknowledge a restriction of appellate review — an appellate court is limited to the facts as established by the record. Cooper v. Adams,295 Ala. 58, 61, 322 So.2d 706, 708 (1975). The proper method on appeal for submitting a record of unreported matters occurring at a hearing is stated in Rule 10(d), Ala. R.App. P. As noted from the excerpt quoted above from the Trust's reply to the defendants' response to its motion to reconsider, the Trust and the defendants disputed before the second trial judge what had actually been argued before the initial trial judge. In their response to the Trust's motion to reconsider, the defendants asserted that "[t]his matter was fully briefed and argued before [the initial trial judge]," and that the Trust had no valid argument that "[i]t was deprived of a reasonable opportunity to present material in opposition to summary judgment and [was] not given adequate notice of the defendants' argument in support of summary judgment."
Finally, even if we accept at face value the Trust's "after the fact" description in its reply of what transpired at the November 20 hearing, at most it appears that the Trust requested that before the trial court "converted" the motion to dismiss into one for a summary judgment, the Trust be given notice so that it could submit evidentiary materials in opposition. The Trust did not, and does not, assert that the trial judge agreed to that request. Further, there was actually no "conversion" of a motion here because a duly identified motion for a summary judgment was pending at the hearing. The fact that the Trust unilaterally took the position at the hearing that the summary-judgment motion would have to be ignored because it lacked a formally specified narrative summary of undisputed material facts would not bind the trial judge.
We turn then to the question whether the motion for a summary judgment, considered completely apart from the subsequently filed and untimely submission in support of the motion, was deficient with regard to the requirement that a summary-judgment motion contain a narrative statement of undisputed material facts. The Trust cites Northwest Florida Truss, Inc. v. Baldwin CountyCommission, 782 So.2d 274 (Ala. 2000), along with Tucker v.Morgan, 833 So.2d 68 (Ala.Civ.App. 2002); Moore v. ClaimSouth,Inc., 628 So.2d 500 (Ala. 1993); Thompson v. Rehabworks ofFlorida, Inc., 727 So.2d 807 (Ala.Civ.App. 1997); and Hale v.Union Foundry Co., 673 So.2d 762 (Ala.Civ.App. 1995), in support of its contention that granting a motion for a summary judgment that does not contain a formally designated narrative statement of undisputed material facts is reversible error.
In Northwest Florida Truss, the summary-judgment motion simply stated in a conclusory fashion that there was no genuine issue as to any material fact and that the movant was entitled to judgment as a matter of law, "`based upon the previous filings and briefings made in connection with,'" 782 So.2d at 276, an earlier motion for a summary judgment filed by an entirely different party. This Court noted that a party moving for a summary judgment "always bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that it argues demonstrates the absence of a genuine issue of material fact." 782 So.2d at 276. The Court concluded that Rule 56(c) "does not allow a party to file a simplistic motion devoid of a narrative summary and specific references *Page 484 
to those portions of the record demonstrating that no genuine issue of material fact exists." 782 So.2d at 277.
Likewise, in Moore, supra, we condemned a summary-judgment motion that "did not contain anything close to a narrative summary of what [the movant] contended to be the undisputed material facts"; rather, the motion simply stated that there was no genuine issue of material fact and that the movant was entitled to judgment as a matter of law based on the pleadings and depositions, but made "no specific reference to any of those documents." 628 So.2d at 501. The cases from the Court of Civil Appeals cited by the Trust involved similarly seriously deficient motions for a summary judgment.
This Court held in International Fidelity Insurance Co. v.Gilliam, 659 So.2d 24 (Ala. 1995), however, that a converted motion for a summary judgment that did not contain a separately identified narrative summary of undisputed material facts was nonetheless procedurally sufficient under the provision of Rule 56(c)(1) that allowed the narrative summary to "be attached as an exhibit." The Court held that "[t]he motion included exhibits sufficient to meet the narrative summary requirement of Rule 56." 659 So.2d at 27. See also Cashion v. Torbert, 881 So.2d 408
(Ala. 2003).
The first summary-judgment motion filed by the defendants sufficiently complied with Rule 56(c)(1) so that the trial judge did not err in considering it on the merits. It set forth in clear narrative form the relevant material facts it deemed to be undisputed, attaching as exhibits the "supporting documents that are not on file," as allowed by Rule 56(c)(1). It included "citations to legal authority" in the form of citations to the provisions of the Alabama Code (and one decision of this Court) establishing statutes of limitation for claims of breach of contract, fraudulent suppression, accounting, and unjust enrichment. It clearly stated that, because the attachments established that coal-mining operations had ceased on the premises by the end of 1989, the Trust's claims relating to nonpayment of royalties were barred by the applicable statutes of limitation. That was the sole basis for the partial summary judgment entered by the trial judge on November 28, 2001, in which he found that "[t]here is no disputed material fact that no mining operations have taken place on plaintiffs' property since 1989" and concluded that because "[t]he causes of action pled in the complaint are all based on the mining operations which ceased in 1989," the applicable statutes of limitation "bar recovery or relief under any cause of action except the fraudulent suppression claim."
 II. Merits of First Motion for Summary Judgment
The Trust argues that a number of its claims are not "based on" the defendants' cessation of coal-mining operations in 1989, but rather relate to "numerous breaches of the Lease (and other wrongful acts) that occurred more recently than 1989, including many that date back only to 1999 and continue to this date." (Trust's reply brief, p. 4.) Although the Trust states in a footnote to its initial brief that it does not concede that all coal mining ceased on the premises in 1989, it offers no argument in opposition to that fact other than to note its ignorance, which it alleges is caused by the lack of full discovery.
 "In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and whether the movant was `entitled to a judgment as a matter of law.' Wright v. *Page 485 Wright, 654 So.2d 542 (Ala. 1995); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990)."
Hobson v. American Cast Iron Pipe Co. 690 So.2d 341, 344 (Ala. 1997).
The defendants made a prima facie showing that there is no genuine issue of material fact as to when coal-mining operations ceased on the leased premises. The Trust did not exercise its option under the last sentence of Rule 56(c)(1), if it contended that that material fact was in dispute, of filing a statement in opposition. It sought no continuance to conduct or to compel discovery. Although the burden had shifted to it "to present substantial evidence creating such an issue," 690 So.2d at 344, it submitted no opposing evidence — substantial or otherwise. Thus, for purposes of the application of any statute of limitation the defendants established the undisputed fact that coal-mining operations had ceased on the leased premises after January 1989. Both parties cite AC, Inc. v. Baker,622 So.2d 331, 335 (Ala. 1993), for the proposition that a claim alleging breach of contract must be brought within six years of the date of the breach. (Trust's brief, p. 5; Defendants' brief, page 26.) The Trust does not dispute the legal proposition asserted by the defendants that there is no "discovery rule" applicable to a breach-of-contract claim. (Defendants cite Henson v. Celtic LifeInsurance Co., 621 So.2d 1268, 1274 (Ala. 1993), for the proposition that the "discovery rule" applies only to fraud claims.) The Trust's breach-of-contract averments were set out in paragraph 19 of its complaint as follows:
 "Defendants failed and neglected to perform in material breach of the Lease by, among other things: failing to pay royalties on coal actually mined, removed, and sold from the Premises; failing to furnish true and correct statements showing the amount, dates, and selling price of coal actually mined, removed, and sold from the Premises; denying [the Trust] access to defendants' books, accounts, sales record, maps and plans for the purpose of verifying the amount and selling price of coal taken from the Premises; refusing, upon written request, to direct third parties to make available all information relating to coal mined from the Premises necessary for those same purposes; and refusing, upon written notice and within sixty (60) days, to correct said material breaches."
For the reasons stated, the November 28, 2001, partial summary judgment is due to be affirmed as to the claim that the defendants failed "to pay royalties on coal actually mined, removed, and sold from the Premises." The Trust argues, however:
 "If the Defendants are correct in arguing that [the Trust's] claims for nonpayment of royalties are subject to a six year statute of limitations that began running in 1989, [the Trust] may or may not be entitled to recoup the One Hundred *Page 486 
Forty-five Thousand ($145,000) Dollars in missing royalties that all evidence suggests was not paid by Defendants as it should have been. But [the Trust] is certainly entitled, for so long as the Lease remains in effect and for so long as Defendants continue to occupy the Premises and exploit the Premises for their own financial gain, to a full accounting of the Defendants' activities on the Premises, to the full production of Defendants' records of their mining activities on the Premises, and to the full production of Defendants' financial records of royalty payments on coal mined from the Premises."
(Trust's reply brief, p. 7.)
All of the claims of breaches of the lease based on the defendants' alleged failure or refusal to provide information or access to information are dependent upon paragraphs 5 and 6 of the lease. Under paragraph 5, United Land is obligated to provide monthly statements in connection with "[a]ll payments of royalties," reflecting various information relating to the computation of royalty, including "the exact amount of coal removed during the preceding month." However, also in paragraph 5 "[i]t is agreed that Lessee shall not be required to furnish statements for months in which coal is not mined, removed and sold under this Lease." At six-month intervals, the lessee is to furnish maps showing "mining progress on the Premises during the previous six months, and . . . the results of test holes and coal analysis, if any, for coal mined on the Premises during the previous six months." Paragraph 6 of the lease authorizes the Trust to inspect United Land's "books, accounts, sale records, maps and plans for the purpose of ascertaining the amount of coal taken from the Premises, and verifying the selling price of the coal sold." That paragraph also obligates United Land, upon written request from the Trust, to "authorize and direct" third persons with whom United Land "shall have had any dealings with respect to coal mined from the Premises" to make available to the Trust "all information relating to coal mined from the Premises, as may be reasonably required by [the Trust] to verify or to determine the amount of royalties due to be paid by [United Land] under this lease, or any other matter relating to performance of [United Land's] obligations hereunder."
It having been established, for the purposes of our analysis, that no coal was mined, removed, and sold under the lease after January 1989, any breach of the obligations in the lease to provide information or access to information relating to coal mined, removed, and sold from the premises necessarily would have occurred more than six years before the filing of this action. Accordingly, summary judgment based on expiration of the statute of limitation was warranted as to those breach-of-contract claims as well, and the defendants had no duty under the lease to furnish information at later times in the absence of the renewal of coal-mining operations on the leased premises.
In its demand for an accounting the Trust asserts that the defendants have failed to provide the necessary information and access to information required by the lease and that an accounting is needed so that the Trust can reconcile "the payments received by defendants for coal mined from the Premises, and the royalties paid to the plaintiff on the same." Again, it having been established for the purposes of this appeal that the defendants have not mined any coal from the leased premises since 1989, all statutes of limitation possibly applicable to an accounting for coal taken and sold have expired. Waters v.Cochran, 291 Ala. 610, 285 So.2d 474 (1973). The same is true for the Trust's claim that the defendants have been unjustly enriched by having received "royalties *Page 487 
and income from coal mined on the premises," which they failed to remit to the Trust.
The Trust devotes no argument in its briefs to its claim for rescission; rather, it argues persistently that the lease continues in full force and effect. Matters not argued in brief are deemed waived. Moore v. Prudential Residential Servs. Ltd.P'ship, 849 So.2d 914, 923 (Ala. 2002). Accordingly, the Trust has waived any contention that the summary judgment was erroneously entered as to its claim for rescission of the lease.
Therefore, the trial court did not err in entering the November 28, 2001, partial summary judgment for the defendants as to all claims except the fraudulent-suppression claim.
 III. The Second Motion for Summary Judgment
After the entry of the first summary judgment, certain discovery was conducted, including the depositions of JWR employee Danny Hagood and Davant. The defendants then moved for a summary judgment with respect to the remaining fraudulent-suppression claim, arguing, among other things, that the undisputed evidence established that no suppression had in fact taken place and that the two-year statute of limitation applicable to a fraudulent-suppression claim had run. The defendants submitted Charles A. Dixon's affidavit, originally submitted with U.S. Pipe's summary-judgment motion in the Texas action, and a copy of the order and judgment in the Texas action; a copy of Davant's deposition; and copies of three letters produced by Davant from his files, written to him in 1986 and 1987 by representatives of JWR. Davant acknowledged in his deposition that the essentials of the fraudulent-suppression claim were stated in paragraph 23 of the complaint, which alleged:
 "In violation of their duty to disclose, the defendants failed and omitted to inform plaintiff that they continued to mine coal from the Premises after January 1986, that they continued to sell coal from the Premises and receive payment for said coal after January 1986, and that they continued to pay royalties on this coal to the owner of the other one-half (1/2) undivided interest in the Premises. Under the pretense that no coal had been mined, defendants also failed and omitted to supply reconciliation statements from January 1986 to the present date."
In the first of the three letters the defendants submitted in support of their motion, Dixon wrote to Davant on February 7, 1986, identifying himself as "JWR's Vice President, Mining Engineering" and stating, in pertinent part, as follows:
 "In response to your question concerning our plans for mining of the property leased from you and from the Davant Trust, please note the following:
 "1. For the 51.75 acres in Section 3 which is leased from you and the Davant Trust:
 Projected "Time Interval Production
 Remainder Fiscal Year 1986 (Feb.-Aug.) 60,000 Tons Fiscal Year 1987 0 Tons Fiscal Year 1988 60,000 Tons
 "In 1988 the initial mining will be completed and there will be several years with no projected production. Later, *Page 488 
some secondary mining of pillars is anticipated."
The letter concluded, "I hope this information is sufficient for your requirements. If you need anything further do not hesitate to call me," and provided a telephone number. Davant acknowledged in his deposition that he had received the letter and that the 51.75 acres referenced was the same tract at issue in this action.
The second letter, written to Davant on January 19, 1987, by Jim Hayes, associate mine planner for JWR, enclosed "a map depicting the area from which coal has been mined during the last six (6) months of 1986" and referred to the "11.75 acres" leased from Davant and the Hortense Davant Trust. Hayes concluded his letter with the statement "[i]f you have any questions, feel free to contact me at" and provided a telephone number. Davant acknowledged in his deposition that he had received this letter also and that he had understood it to tell him that coal had been mined from a portion of the leased premises during the last six months of 1986.
On July 7, 1987, Hayes wrote Davant again, enclosing another map, this time "depicting the area from which coal has been mined during the first six (6) months of 1987" from the area leased from Davant and the Hortense Davant Trust. Hayes closed his letter with the invitation to Davant to "feel free to contact me" at his listed telephone number, if Davant had any questions. Davant acknowledged on his deposition that he had received the letter and that it told him that coal had been mined from the 51-acre tract involved in this action during the first six months of 1987.
When asked on deposition if these three letters had served to tell him that mining was taking place on the property during the time frames specified in the letters, Davant answered "[a]pparently, there was more mining going on, and they sent me those letters. Why they didn't send me the tonnage reports, I don't know." Davant acknowledged that he had never telephoned or made any effort to contact anyone at U.S. Pipe or JWR during 1986 or 1987 to ask about his royalty checks, explaining that he had not done so "because I didn't think they wouldn't pay me." He further acknowledged that he made no inquiry at any other time until 1999. Throughout that period, however, he "had lots of contact with them." Specifically, he telephoned Danny Hagood from time to time to inquire concerning production from the Hortense Davant Trust; he simply omitted on those occasions any inquiries about the property involved in this litigation. He acknowledged that Hagood had always been very helpful and had answered any questions he had about any of the properties and conceded that "I never doubted that I could get the answers that I asked for, at any time."
Davant is a lawyer who has been licensed to practice in Texas since 1963, with ample experience in "oil and gas," and he "had dealt with oil and gas leases many times"; the lease involved in this case was the first time he had ever dealt with an underground coal-mining lease, however.
In its November 16, 2001, response to the second summary-judgment motion, the Trust submitted two letters U.S. Pipe had sent to Davant in 1987. Pertinent to an understanding of the import of those letters is paragraph 4(B) of the lease, which reads:
 "Lessee shall pay to the Lessor a minimum royalty of Twenty-five Dollars ($25.00) per month until termination due to term or otherwise as provided for herein. All royalty paid for coal actually mined, removed and sold during any month hereunder shall be credited upon the minimum royalty for such month. All royalty due for coal actually mined, *Page 489 
removed and sold during any month during the initial term or any extended term in excess of the minimum royalty for that month shall be credited, firstly, against any previous minimum royalty payments against which excess production royalties have not been applied, and, secondly, against any future monthly minimum royalties. That is to say that all production royalties are to be credited against any minimum royalties that become due or have been paid under the terms hereof. . . ."
In a March 24, 1987, letter to Davant, the assistant supervisor of general accounting for U.S. Pipe stated:
 "According to the terms of our contractual agreement dated August 15, 1984 we are authorized to credit production royalties paid in excess of minimum payments due, firstly, against any previous minimum royalty payments to which excess production royalties have not been applied, and secondly, against any future monthly minimum royalties. Due to recoveries totaling $50.00 for the months of January and February, the balance of payments in excess of minimums recovered has been reduced to $670.23.
 "If you have any questions concerning this matter, please contact me. . . ."
An April 17, 1987, letter stated:
 "Due to price and moisture adjustments recorded during the period of May 1986-November 1986, and an overpayment resulting from an overstatement in sales price per ton during November 1986, the balance of payments in excess of minimums recovered has been reduced to $435.79 as follows:
"Balance, March 1987 $ 670.23
"Less: Recovery April 1987 25.00
 Amount payable due to price moisture adjustment 1,455.98 (we owe you)
 "Add: Amount resulting from over-payment Nov. 1986 1,246.54 ________ (we paid you)
"Balance, April 1987 $ 435.79"
The information in the March 24 letter is to the effect that U.S. Pipe had paid Davant for "production royalties," i.e., "royalty due for coal actually mined," the sum of $720.23 and was electing to apply that production royalty "balance of payments" against the $25 per month minimum royalties that would otherwise have been owing for the months of January and February, as authorized by lease provision 4(B) ($670.23 + $25 + $25 = $720.23). The balance of payments in excess of minimum royalties was thus "reduced to $670.23," which U.S. Pipe was authorized under paragraph 4(B) of the lease to credit "against any future monthly minimum royalties."
The April 17 letter advised that the $670.23 balance of payments from March was being further reduced by (1) a debit for the $25 April minimum royalty and (2) a debit in the net amount of $209.44 resulting from an overpayment credit. Thus, the royalty balance of payments for coal actually mined and previously paid for was reduced to $435.79, available for credit against future minimum royalties.
Davant argues that these two letters, in the absence of reconciliation statements, *Page 490 
indicated that no coal was being mined from the property and represented "conflicting and inconsistent correspondence from Defendants," such that he "acted reasonably in assuming that Defendants were not mining the Premises." (Trust's brief, p. 42.) We disagree. The February 7, 1986, letter had advised Davant that JWR expected to mine 60,000 tons of coal under the lease during the period of February to August 1986. The January 19, 1987, letter had included a map depicting the area from which coal had been mined during the period June to December 1986. As a result, as reflected by the March 24, 1987, letter, the "balance of payments" for royalties paid for coal actually mined amounted to $720.23 at the end of 1986. The March and April letters explained adjustments to that credit balance, and reflected that there had been no coal removed and sold from the leased premises during January, February, or March 1987, at least none sufficient to generate production royalty over minimum royalty. (The two letters reflected three $25 per month minimum royalty payments debited against the balance-of-payments credit, and the April minimum royalty was not yet due under the terms of the lease.) The April 17 letter advised Davant that there had been an "overstatement in sales price per ton during November 1986," thereby acknowledging that coal had been sold during that month.
Finally, the July 7, 1987, letter had included a map reflecting the area from which coal "has been" mined during the first six months of 1987, thereby reflecting the coal-mining activity that had transpired, by process of elimination, during April, May, and/or June 1987. The $435.79 production royalty credit balance referred to in the April 17 letter would have been available to cover, to that extent, the royalties generated.
Thus, contrary to the Trust's claim in its complaint that "the defendants failed and omitted to inform plaintiff that they continued to mine coal from the Premises after January 1986, [and] that they continued to sell coal from the Premises and receive payment for said coal after January 1986," Davant was so informed. As noted earlier, the only uncertainty Davant expressed during his deposition was the statement, "why they didn't send me the tonnage reports, I don't know." Nonetheless, as noted, he never brought the matter up despite ongoing communications with Danny Hagood. Most telling was Davant's answer during his deposition when asked why he had not telephoned to ask where his royalty checks were: "Probably an omission on my part, thinking that if they were going to pay me and probably they didn't pay me, and I just went on with my day to day activities of carrying on and forgot about it."
To sustain a claim of fraudulent suppression a plaintiff must prove, among other elements, "`concealment or nondisclosure of material facts by the defendant.'" Auto-Owners Ins. Co. v.Abston, 822 So.2d 1187, 1197 (Ala. 2001) (quoting Foremost Ins.Co. v. Parham, 693 So.2d 409, 423 (Ala. 1997)). "Where the record indicates that the information alleged to have been suppressed was in fact disclosed, and there are no special circumstances affecting the plaintiff's capacity to comprehend, the plaintiff cannot recovery for suppression." Ex parte AlfaMut. Fire Ins. Co., 742 So.2d 1237, 1243 (Ala. 1999). "In other words, plain disclosure to a person competent in intelligence and background to understand the disclosure is the legal antithesis of suppression, by definition." Allstate Ins. Co. v. Ware,824 So.2d 739, 746 (Ala. 2002).
Moreover, claims alleging fraudulent suppression are subject to a *Page 491 
two-year statute of limitation. Parham, 693 So.2d at 417.
 "[T]he limitations period begins to run when the plaintiff was privy to facts which would `provoke inquiry in the mind of a [person] of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud.' Willcutt v. Union Oil Co., 432 So.2d 1217, 1219 (Ala. 1983) (quoting Johnson v. Shenandoah Life Ins. Co., 291 Ala. 389, 397, 281 So.2d 636 (1973)); see also Jefferson County Truck Growers Ass'n v. Tanner, 341 So.2d 485, 488 (Ala. 1977) (`Fraud is deemed to have been discovered when it ought to have been discovered. It is sufficient to begin the running of the statute of limitations that facts were known which would put a reasonable mind on notice that facts to support a claim of fraud might be discovered upon inquiry.')."
Auto-Owners, supra, 822 So.2d at 1195.
As noted, despite the information contained in the letters written him during 1986 and 1987, Davant — either in his individual capacity or subsequently in his capacity as trustee of the Trust — never inquired of the defendants about the status of coal mining on the leased property.
The Hortense Davant Trust was scheduled to terminate at the end of 1999 and Davant wanted to buy its interest in the leased premises along with its interest in other properties. He hired a geologist with whom he had previously worked, Reese Mallett, to investigate "whether there might be any value left . . ., what tonnages, [and] what had actually transpired on" the 51 acres. Mallett reviewed records at JWR and conducted other investigations and reported back to Davant, who by this time was the trustee of the Trust, that about 135,000 tons of coal had been mined from the property; Davant had estimated from the royalty checks he had records of having received that only approximately 25,000 tons had been extracted. Davant followed up Mallett's report by meeting with Dixon at his office on July 29, 1999. Davant told Dixon that it appeared that JWR had mined his coal and sold it without giving him his royalty payments under the lease. Davant testified in his deposition: "That was the first time I had ever had any concerns that I had not been paid — that I had not been treated honestly under the lease." In August 1999, he requested information from the bank acting as trustee for the Hortense Davant Trust concerning payments it had received, thinking that perhaps his share of royalties had been paid to the Hortense Davant Trust. The bank wrote Davant on August 25, 1999, and based on the information they shared, he continued to have concerns that he had not been paid all the royalties due under the lease.
Considering all of these circumstances, we conclude that (1) no suppression or nondisclosure of the fact of post-January 1986 mining occurred, as alleged by paragraph 23 of the complaint, and (2) even assuming a lack of full disclosure, more than two years before the Trust filed this action it had received sufficient disclosures to trigger the running of the two-year statute of limitations for fraud. Therefore, the summary judgment entered for the defendants on May 1, 2003, based on the trial court's dual findings that "there was no fraudulent suppression and . . . the plaintiffs claim is time barred by the statute of limitations" was not in error.
The summary judgments are affirmed.
AFFIRMED.
NABERS, C.J., and SEE, BROWN, and STUART, JJ., concur. *Page 492