[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 952 
The plaintiffs below, Johnny F. Nesbitt and Jan Nesbitt, appeal from a summary judgment in favor the of the defendants Charlie Frederick, Jr., and Jo Anne Frederick on the Nesbitts' claims alleging fraudulent misrepresentation and fraudulent suppression, and in favor of the defendants Anne McNew and McNew Appraisal Services (hereinafter collectively "McNew") on the Nesbitts' claims alleging negligent, reckless, and innocent misrepresentation.
 I. Factual Background and Procedural History
In 1987, the Fredericks built a one-story house with an unfinished basement. The house was designed so that "backfill" or dirt covered the rear of the house to the height of the basement. Charlie Frederick testified that during construction a backhoe operator started "backfilling" one of the basement walls before the concrete blocks had "set." The backfilled material applied pressure to the wall, causing it to tilt slightly. To remedy the problem, the contractor installed a series of angle iron braces against the interior basement wall.
In 2000, the Fredericks decided to sell their house. They listed it with Veronica Stephens, a licensed real-estate agent. Around October 2000, the Nesbitts, who were interested in buying a house, and their realtor, Janice Johnsey, viewed the Fredericks' house. The Nesbitts viewed the house four times before ultimately purchasing the house, the last visit being the "walk through" immediately before the closing.
The Nesbitts first viewed the house in October 2000. The Nesbitts testified that they were immediately impressed with the house and that they did not notice any problems with its structural stability. When the Nesbitts were in the basement, Johnny saw the braces, and he asked Johnsey to find out why the braces had been installed. Johnny testified that Johnsey later told him that the braces had been installed when the house was built. Johnny also testified that this was the only information Johnsey gave him about the braces. Johnny could not say with certainty when he received this information, but he said that it was possible that it was before his second visit to the house. Johnsey testified that she telephoned Stephens after discussing the braces with Johnny. Johnsey testified that Stephens told her that the braces were installed "in homes like that" and that they were "just added reinforcement." Johnsey also testified that she "believed" she relayed this information back to Johnny. Stephens testified that she spoke with Johnsey about the braces and that she told Johnsey that the braces "were put there as a precautionary measure . . . just to reinforce."
The Nesbitts' second visit to the house occurred the weekend after the first visit. In addition to Johnsey, the Nesbitts brought the following people with them to view the house: Brian Nesbitt, their adult son; Don Mathews, a friend of the Nesbitts and a paint contractor; and Janice Johnsey's husband. Johnny testified that he brought these people to view the house in order to get their opinion about the *Page 953 
house. Each person that viewed the house on that visit indicated that he or she was satisfied with its condition. The Nesbitts visited the house a third time to discuss purchasing the Fredericks' television and entertainment center.
On November 27, 2000, the Nesbitts made a written offer to purchase the Fredericks' house.[1] On December 1, 2002, the Fredericks and the Nesbitts entered into a contract pursuant to which the Fredericks would sell their house to the Nesbitts for $160,000. The following portions of the sales contract entered into between the Nesbitts and the Fredericks are relevant to the issues raised in this appeal:
 "10. NECESSITY OF INSPECTION: Buyer acknowledges and agrees that Alabama law imposes a duty on Buyer to thoroughly inspect a property, for defects or otherwise, in accordance with the terms of this contract and prior to closing the sale. Buyer further acknowledges and agrees that he/she is aware that professional inspection services and/or contractors may be engaged for this purpose and that Realty South[2] and its sales associates strongly recommend the use of such professionals. . . . After closing of this sale, all conditions of the property are the responsibility of the purchaser.
 "11. CONDITION OF THE PROPERTY: Neither seller nor broker nor any sales associate makes any representations or warranties regarding condition of the property except to the extent expressly set forth herein. Buyer has the obligation to determine any and all conditions of the property material to Buyer's decision to buy the property, including but not limited to, . . . the roof and basement, including leaks therein; . . . construction materials and workmanship; [and] structural condition. . . . Note: Lenders and/or public authorities may require certain investigations such as termite and septic tank inspections (for which repairs may be required), BUT THIS DOES NOT REPLACE BUYER'S DUTY TO THOROUGHLY INSPECT THE PROPERTY PRIOR TO CLOSING.
 "(A) Buyer agrees to accept the property in `AS IS' condition, including ordinary wear and tear to the closing. Seller gives no warranties on any systems or appliances being in good working order either now or at the time of closing and in consideration for this sales price, Buyer accepts total responsibility for all repairs, improvements, and/or defects in the property. Walk-through will be to determine only that no further deterioration other than ordinary wear and tear has occurred.
 "(B) Buyer has inspected the property, either personally or through others of Buyer's choosing, and, without relying on any representation or warranty from Seller or Broker or any sale associate or any printed or written description of the property, accepts the property in its present `AS IS' condition, including ordinary wear and tear to closing, except that Seller agrees to (1) deliver the heating, cooling, plumbing, electrical systems and built-in appliances in normal operating condition at the time of closing. . . .
 "12. WALK-THROUGH INSPECTION: Buyer has the right and the *Page 954 
responsibility to walk through and inspect the property prior to closing and notify Seller immediately if the property is not in the condition agreed under [`B']. This inspection is intended only to verify that the terms of Paragraph 11 have been met. If the Buyer fails to conduct this inspection, Seller's repairs and maintenance obligations will be deemed fulfilled. . . . After closing, all conditions of the property are the responsibility of the Buyer.
 ". . . .
 "21. ENTIRE AGREEMENT: This contract constitutes the entire agreement between Buyer and Seller regarding the property, and supersedes all prior discussions, negotiations and agreements between the Buyer and Seller, whether oral or written. Neither Purchaser, Seller, Broker, nor any sales associate shall be bound by any understanding, agreement, promise, or representation concerning the property, expressed or implied, not specified herein."
(Capitalization and other emphasis in original.)
The Nesbitts applied for a mortgage loan with Countrywide Home Loans, Inc. ("Countrywide"), to pay for a portion of the purchase price. Countrywide contracted with McNew to conduct an appraisal of the house. McNew appraised the house and prepared an appraisal report, dated January 28, 2001, estimating the value of the house to be $160,000. The appraisal report stated that the appraisal was prepared to provide an estimate of the market value of the house and that it was not an opinion of the structural condition of the house.[3]
The Nesbitts visited the house a fourth time before the closing to conduct a "final walk-through." The Nesbitts visited the house with Johnsey and their son, Brian. Johnny testified that he was satisfied with the condition of the house after inspecting it during the final walk-through. The Nesbitts decided not to hire a professional home inspector to inspect the house before closing.
On April 6, 2001, the Nesbitts closed on the house. The Nesbitts allege that after they moved into the house, they began to notice structural problems. The Nesbitts *Page 955 
hired David Carlysle, a home inspector, to perform a professional inspection of the house. Carlysle's inspection report states that there is evidence of the "foundation wracking forward" and evidence indicating that various cosmetic repairs had been undertaken in an attempt to correct the structural problems.
On June 26, 2002, the Nesbitts sued the Fredericks in the Jefferson Circuit Court, alleging fraudulent misrepresentation, fraudulent suppression, and negligence. The claims were based on the Nesbitts' allegation that the Fredericks failed to disclose a structural defect in the basement foundation wall where the braces were located and that this defect had caused the house to shift, resulting in structural problems. On December 3, 2002, the Nesbitts amended their complaint to add McNew as a defendant. The amended complaint alleged that in the appraisal report McNew misrepresented the condition of the house.
The Fredericks filed a motion for a summary judgment on May 26, 2004, and McNew filed a motion for a summary judgment on May 28, 2004. The trial court granted both motions, and the Nesbitts appealed.
 II. Standard of Review
The standard of review for the grant or denial of a summary-judgment motion is as follows:
 "`We review this case de novo, applying the oft-stated principles governing appellate review of a trial court's grant or denial of a summary judgment motion:
 "`"We apply the same standard of review the trial court used in determining whether the evidence presented to the trial court created a genuine issue of material fact. Once a party moving for a summary judgment establishes that no genuine issue of material facts exists, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. `Substantial evidence' is `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' In reviewing a summary judgment, we view the evidence in the light most favorable to the nonmovant and entertain such reasonable inferences as the jury would have been free to draw."'
 "American Liberty Ins. Co. v. AmSouth Bank, 825 So.2d 786, 790 (Ala. 2002) (quoting Nationwide Prop. Cas. Ins. Co. v. DPF Architects, P.C., 792 So.2d 369, 372 (Ala. 2000) (citations omitted))."
General Motors Corp. v. Kilgore, 853 So.2d 171, 173
(Ala. 2002).
 III. Propriety of the Summary Judgment A. The Fredericks
The Nesbitts appeal only as to their claims against the Fredericks alleging fraudulent misrepresentation and fraudulent suppression.[4]
An essential element of fraudulent-misrepresentation and fraudulent-suppression claims is a duty to disclose. Alabama *Page 956 
has abrogated the rule of caveat emptor in the sale of a new house; however, the rule still applies to the sale of a "used" house. Moore v. Prudential Residential Servs. Ltd.P'ship, 849 So.2d 914, 923 (Ala. 2002); Blaylock v.Gary, 709 So.2d 1128, 1130 (Ala. 1997); and Ray v.Montgomery, 399 So.2d 230, 233 (Ala. 1980). Thus, a seller of used residential real estate ordinarily has no duty to disclose to the purchaser any defects in the property.Moore, 849 So.2d at 923; Blaylock,709 So.2d at 1130; and Cato v. Lowder Realty Co., 630 So.2d 378,382 (Ala. 1993).
This Court has recognized exceptions to the application of thecaveat emptor rule as it applies to the sale of used residential real estate. If a fiduciary relationship exists between the buyer and the seller, then the seller has a duty to disclose known defects. § 6-5-102, Ala. Code 1975. Seealso Moore, 849 So.2d at 923; and Commercial CreditCorp. v. Lisenby, 579 So.2d 1291, 1294 (Ala. 1991). If the seller "`has knowledge of a material defect or condition that affects health or safety and the defect is not known to or readily observable by the buyer,'" then the seller has a duty to disclose the defect. Moore, 849 So.2d at 923 (quotingFennell Realty Co. v. Martin, 529 So.2d 1003, 1005
(Ala. 1988)). The Nesbitts conceded in the trial court that these exceptions do not apply to the facts of this case.
A third exception to the caveat emptor rule in the sale of used residential real estate arises "`if the buyer specifically inquires about a material condition concerning the property.'" In that situation, "`the seller has an obligation to disclose known defects.'" Moore, 849 So.2d at 923
(quoting Commercial Credit Corp., 579 So.2d at 1294). The Nesbitts argue that this "specific inquiry" exception to the rule of caveat emptor applies in this case because, they say, they specifically inquired about the braces installed in the basement, which, they say, had been installed in an attempt to correct the structural defect that ultimately caused the house to shift. They further argue the Fredericks breached the duty to disclose by not informing the Nesbitts of this defect when they inquired about the braces. The duty to disclose arising from the specific-inquiry exception to the rule ofcaveat emptor is the basis of their fraudulent-misrepresentation and fraudulent-suppression claims against the Fredericks.
The Nesbitts ask this Court to overrule a line of Alabama cases holding that "[w]here a purchaser's direct inquiry would otherwise impose a duty of truthful disclosure, this Court has held that a purchaser's fraud claim is precluded by language in a sales contract stating that the purchase is `as is.'"Moore, 849 So.2d at 924 (citing Leatherwood v.Baker, 619 So.2d 1273, 1274-75 (Ala. 1992); Haygood v.Burl Pounders Realty, Inc., 571 So.2d 1086, 1089
(Ala. 1990); and Massey v. Weeks Realty Co.,511 So.2d 171, 173 (Ala. 1987)). However, we decline to address this argument because we find that the Nesbitts have failed to present sufficient evidence to overcome the Fredericks' summary-judgment motion on their claims of fraudulent misrepresentation and fraudulent suppression.
The Nesbitts argue that although the rule of caveatemptor applies in the sale of used residential real estate, the Fredericks had a duty to reveal truthful information when the Nesbitts specifically inquired about the braces that had been installed in the basement. The Nesbitts allege that the response to their inquiry about the braces amounted to fraudulent misrepresentation and that the Fredericks' failure to disclose that the braces had been installed during construction to remedy the *Page 957 
problems caused by premature backfilling amounted to fraudulent suppression.
 1.
To survive a motion for a summary judgment on a claim of fraudulent misrepresentation, the Nesbitts
 "needed to establish the existence of a genuine issue of material fact as to four elements: `"(1) a false representation, (2) concerning a material existing fact, (3) [reasonably] relied upon by the plaintiff (4) who was damaged as a proximate result."' Fisher v. Comer Plantation, Inc., 772 So.2d 455, 463 (Ala. 2000) (quoting Baker v. Bennett, 603 So.2d 928, 935 (Ala. 1992)). See also Foremost Ins. Co. v. Parham, 693 So.2d 409, 422 (Ala. 1997)."
Moore, 849 So.2d at 923.
Johnny testified that the only information Johnsey related to him concerning the braces was that the braces were installed when the house was built. There is no evidence from the record that this statement is false. In fact, the evidence in the record demonstrates that the braces were indeed installed when the house was constructed. Although Johnsey testified that Stephens told her that the braces were installed "in homes like that" and they were "just added reinforcement" and although Stephens testified that she told Johnsey the braces "were put there as a precautionary measure . . . just to reinforce," the Nesbitts could not have relied on these statements in light of Johnny's testimony that the only thing he was told about the braces was that they were installed when the house was built. Therefore, the Nesbitts have failed to present sufficient evidence to create a genuine issue of material fact as to their claim of fraudulent misrepresentation based upon the information communicated to them about the braces.
 2.
Under this Court's holding in Hope v. Brannan,557 So.2d 1208 (Ala. 1989), the Nesbitts have also failed to present evidence creating a genuine issue of material fact as to their claim of fraudulent misrepresentation or fraudulent suppression. In Hope, Jimmy Hope and Susan Hope decided to purchase a 58-year-old house owned by the James Brannan and Jane Brannan. The sales contract entered into between the Hopes and the Brannans stated the following:
 "`No oral statement, representation, promise or inducement shall have any validity or effect nor shall be a part of this agreement unless specifically written in the agreement. Salesperson and listing agent do not warrant or guarantee, either express or implied, this property, any of the equipment or appliances contained therein, any improvements thereon, the lot or house size or dimensions, the age or square footage of the house, any of the systems used on the property including but not limited to electrical and those used to heat or cool the house, sewer or septic tank availability or condition, or plumbing but to the contrary, the Purchaser represents to the salesperson and the listing agents that Purchaser has personally inspected the premises to their satisfaction and rely solely thereon. Furthermore, Purchaser has inspected the property and improvements without relying on any representation or warranty or any printed or written description of the property and improvements from Seller or any sales person or listing agent'"
557 So.2d at 1209-10.
When the Hopes and the Brannans met, the Brannans gave the Hopes a "termite bond" and a "termite letter" stating that the house had been treated for termites. The Hopes also stated that when they *Page 958 
visited the house they asked William F. Davis, the real-estate agent showing them the house, about the age of the roof, the plumbing, and the wiring and whether there were termites. The Hopes contended that Davis told them that the roof was two years old, that the plumbing and wiring were recent, and that there were no termites. The Hopes claimed that based upon these representations, they purchased the house without further inspection. 557 So.2d at 1210.
After the Hopes moved into the house, they discovered various problems with the house, including broken windows, rotten trim, and a termite infestation; they also discovered that a part of the roof was at least 15 years old and that the closet in the master bedroom was damaged. The Hopes sued the Brannans, Davis, and the real-estate agency alleging both fraudulent misrepresentation and fraudulent suppression. In determining whether a summary judgment for the defendants on their fraud claims was proper, the Court first set out the general rule that the doctrine of caveat emptor applies to the sale of used residential real estate and that "a purchaser may protect himself by express agreement in the contract of sale."557 So.2d at 1210-11 (citing Ray v. Montgomery,399 So.2d 230 (Ala. 1980)). The Court held:
 "With ordinary diligence, the Hopes could have discovered any problems with the house. The Brannans did not prevent the Hopes from inspecting the house before it was sold. The Hopes had ample opportunity to inspect for any damage, and their failure to inspect negates a finding of actionable fraud under these facts. Ray v. Montgomery, supra; Marshall v. Crocker, 387 So.2d 176 (Ala. 1980).
 ". . . The Hopes' failure to inspect the house before purchasing it cannot insulate them from the application of the doctrine of caveat emptor; therefore, the maxim volenti non fit injuria
applies."
557 So.2d at 1211.
The Hopes argued that the specific-inquiry exception applied, giving rise to a duty to disclose, and that the application of this exception defeated the provisions of the sales contract. However, the Court held that, "in the facts of this case, the Hopes cannot overcome their neglect in failing to inspect the house" by relying on the specific-inquiry exception and that "because the Hopes neglected to inspect the house themselves, they cannot take advantage of the specific-inquiry exception to the rule of caveat emptor. 557 So.2d at 1211. Therefore, the Court affirmed the trial court's summary judgment on the Hopes' claims of fraudulent misrepresentation and fraudulent suppression.
The sales contract in the present case is similar to the sales contract in Hope. The contract not only stated that the property was purchased "as is," but also imposed "a duty on Buyer to thoroughly inspect [the] property, for defects or otherwise. . . ." The contract stated that before the closing the buyer had "the right and the responsibility to walk through and inspect the property . . . and notify Seller if the property [was] not in the condition" agreed upon. In addition, the sales contract stated that after the closing "all conditions of the property are the responsibility of the Buyer." Further, the sales contract also explicitly stated that the buyer was not relying on any representations or warranties regarding the condition of the property, and that the buyer had "the obligation to determine any and all conditions of the property material to [their] decision to buy the property, including . . . structural condition." Lastly, the contract stated that the buyer "has inspected the property" and "without relying on any representation *Page 959 
or warranty" of the seller accepts the condition of the property. The Nesbitts testified that they read and fully understood the provisions of the sales contract.
Like the Hopes, the Nesbitts could have discovered any defects in the property through ordinary diligence. The home-inspection report submitted by the Nesbitts in opposition to the summary-judgment motions reveals that the Nesbitts could have discovered the alleged defects in the property upon a diligent inspection. The report details possible problems with the structure of the house: door frames were visibly "wracked" forward; brick veneer was cracked and "lifting"; mortar columns were cracked; the brick above the garage door was visibly cracked; various interior walls were visibly cracked; exterior bricks were misaligned; floor joists were bowing and rotating; and the hardwood flooring in the kitchen had "separations." Further, Johnny testified that the problems with the floor joists would have been visible when he inspected the house but that he "did not notice any of them out of line." He also testified that he believed that the gaps in the hardwood flooring in the kitchen existed at the time he was inspecting the house, but that he failed to notice the gaps. The Nesbitts also admit in their brief that there was "evidence of the defective condition of the home" "at the time of the appraisal" in the form of "steel supports in the basement and cracks in the foundation and mortar" that McNew should have seen when the appraisal was performed.
In addition, as was the case in Hope, there was no evidence here indicating that the Nesbitts were precluded from adequately inspecting the house. To the contrary, the Nesbitts had ample opportunity to inspect the house for any damage or defects. Like the Hopes, the Nesbitts were not unfamiliar with the process of purchasing a house. Johnny testified that the Fredericks' house was the fourth house that he and Jan had purchased, and Jan testified that she had an adequate understanding of the process of buying a house and of the sales contract. We decline to apply the specific-inquiry exception to the facts of this case. See Hope, 557 So.2d at 1211. Like the Hopes, the Nesbitts cannot overcome their neglect in failing to thoroughly inspect the house, and, under the facts of this case, they cannot take advantage of the specific-inquiry exception to the rule of caveat emptor. Therefore, the Nesbitts have failed to present sufficient evidence creating a genuine issue of material fact as to their claims of fraudulent misrepresentation and fraudulent suppression.
 B. McNew
The Nesbitts argue that McNew misrepresented the structural condition of the house in the appraisal report. The Nesbitts also argue that under Fisher v. Comer Plantation, Inc.,772 So.2d 455 (Ala. 2000), the trial court erred in entering a summary judgment for McNew. McNew argues, on the other hand, that the summary judgment was proper, because, she says, she owed no duty to the Nesbitts.
Even if the Nesbitts could show that McNew owed them a duty, the Nesbitts failed to present any evidence indicating that they did, in fact, rely on the appraisal in deciding to purchase the house. See Moore, 849 So.2d at 923
(holding that reasonable reliance is an essential element of a fraudulent-misrepresentation claim). McNew presented the following undisputed evidence to show that the Nesbitts did not rely on the appraisal: the Nesbitts signed the sales contractbefore the appraisal was completed; both Johnny and Jan testified that they did not rely on the appraisal in making the decision to purchase *Page 960 
the house; the Nesbitts did not have any contact with McNew before the closing; Johnny testified that he did not read the appraisal before closing; and Jan testified that she only glanced at the appraisal report at closing.
The Nesbitts argue that they met the reasonable-reliance requirement because, they say, as a condition to obtaining the loan for the purchase of the house, Countrywide, the mortgage lender, should have been informed about the structural condition of the house. Therefore, the Nesbitts essentially argue that they indirectly relied upon the appraisal report, through Countrywide. However, the Nesbitts have failed to cite any authority to show that "indirect" reliance, through Countrywide, is sufficient to meet the reasonable-reliance standard. This Court has stated:
 "`"Where an appellant fails to cite any authority for an argument, this Court may affirm the judgment as to those issues, for it is neither this Court's duty nor its function to perform all the legal research for an appellant. Rule 28(a)[(10)], Ala. R.App. P.; Henderson v. Alabama A M Univ., 483 So.2d 392 (Ala. 1986)." Sea Calm Shipping Co., S.A. v. Cooks, 565 So.2d 212, 216 (Ala. 1990).'"
Kyser v. Harrison, 908 So.2d 914, 917 (Ala. 2005) (quoting Spradlin v. Birmingham Airport Auth.,613 So.2d 347, 348 (Ala. 1993)).
Furthermore, Countrywide could not have reasonably relied upon the appraisal report as a guarantee of the structural quality of the house. The appraisal report stated that "[t]he purpose of the appraisal is to estimate the market value of the real property that is the subject of this report." An addendum attached to the appraisal stated that the purpose and the scope of the appraisal was to provide an estimate of the fair market value of the property. Lastly, the appraisal stated that the appraiser did not "warrant, guarantee or make any representation to structural stability. . . ." Given the limiting language in the appraisal, any reliance by Countrywide upon the appraisal as a guarantee of the structural integrity of the house would have been unreasonable. See Brushwitz v.Ezell, 757 So.2d 423, 430-31 (Ala. 2000) (holding that a buyer's reliance on an appraisal report in deciding whether to purchase a house would be unreasonable given that the appraisal contained limiting language that it was not an evaluation of the condition of the house).
 Conclusion
We affirm the summary judgment for the Fredericks and McNew.
AFFIRMED.
NABERS, C.J., and SEE, HARWOOD, WOODALL, STUART, and PARKER, JJ., concur.
LYONS and BOLIN, JJ., concur in the result.
[1] The Nesbitts testified that they made this offer after discussing the braces with Johnsey and around the time of the Nesbitts' third visit to the house.
[2] The sales contract indicates that RealtySouth was the agent of "both seller and buyer"; RealtySouth is not a party to this action.
[3] The appraisal report contained the following contingent and limiting conditions:
 "The appraiser has noted in the appraisal report any adverse conditions . . . observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions . . . that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, expressed or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property."
The appraisal report also contained the following addendum:
 "THE PURPOSE OF THIS APPRAISAL IS TO PROVIDE AN ESTIMATE OF THE MARKET VALUE OF THE ABOVE REFERENCED PROPERTY. THE APPRAISER DO[ES] NOT WARRANT, GUARANTEE OR MAKE ANY REPRESENTATION TO STRUCTURAL STABILITY OR THE CONDITION OR OPERATION OF ANY EQUIPMENT, HEAT, AIR CONDITIONING, SEPTIC TANK OR ANY OTHER COMPONENT, UNLESS DEFICIENCIES ARE CLEARLY VISIBLE AND SO STATED IN THE APPRAISAL REPORT."
(Capitalization in original.)
[4] The Nesbitts' only argument on appeal as to their claims against the Fredericks is that this Court should overrule current caselaw related to the effect on a buyer's fraudulent-misrepresentation and fraudulent-suppression claims of an "as is" provision in a contract. The Nesbitts do not address the negligence claim in their brief to this Court. Accordingly, the Nesbitts have waived any contention that summary judgment was erroneously entered as to their negligence claim. See Davant v. United LandCorp., 896 So.2d 475, 487 (Ala. 2004) ("Matters not argued in brief are deemed waived.").