STUART, Justice.
Richard M. Gilley sued his former employer, Southern Research Institute (“SRI”), seeking compensation he alleged *1216 he was owed as a result of his work leading to SRI’s procurement of United States Patent No. 5,407,609 (“the '609 patent”). He subsequently amended his complaint and added SRI’s one-time subsidiary, Brookwood Pharmaceuticals, Inc. (“Brook-wood”), and Brookwood’s subsequent owner, SurModics, Inc., in place of fictitiously named defendants. The trial court entered a summary judgment in favor of SRI, and Gilley appealed that judgment to this Court. We affirm.
I.
Although the record filed in conjunction with Gilley’s appeal encompasses 31 volumes, the relevant facts are straightforward and undisputed. While they were employed by SRI, Gilley and his associate Thomas Tice developed a new process of encapsulating drugs that had specific application with regard to the production of slow-release medications. SRI thereafter sought to patent the process, and, bn April 18, 1995, the United States Patent and Trademark Office granted SRI’s patent application and issued the '609 patent, listing Gilley and Tice as the inventors of record.
When he was hired by SRI in 1979, Gilley executed a contract acknowledging that any “improvements, inventions and discoveries” made by him during the tenure of his employment would “be the sole and exclusive property of [SRI].” Nevertheless, SRI had a policy whereby it did provide additional compensation to employees in some instances when it derived income from patents the employees had played a role in obtaining and/or commercializing. On August 25,1994, SRI revised its policy in this regard, modifying the “Royalties” section of its “Policies and Procedures Manual” to state the following (hereinafter referred to as “the SRI awards policy”):
“[I]f [SRI] derives intellectual property income from patents or inventions which it own[s], it will share such income with the inventor(s) and other [SRI] employees who [SRI] considers^] in its sole discretion, to have made a significant contribution to the generation of such income (contributor(s)) on the basis of 80% to [SRI] and 20% to inventors and contributors (after recovery of legal and other costs). An inventor or contributor must be currently employed at [SRI] o[r] formally retired (minimum of 55 years of age and 10 years of service) from [SRI] to receive a full share of such income. If no longer employed by [SRI], the inventor or contributor will receive one-half of the share that would otherwise be due. The resulting reduction will not affect the share due any other eligible inventor or contributor. If an inventor or contributor is deceased, intellectual property income due that person will be distributed to that person’s estate.”
In approximately July 1996, SRI and Gilley decided to end then- employer-employee relationship, and, on July 18, 1996, they executed an agreement setting forth the terms of their separation (“the separation agreement”). Pursuant to the terms of the separation agreement, Gilley was placed on paid administrative leave through December 31, 1996, and SRI agreed to provide him with an office and out-placement services during that period. The separation agreement further provided:
“During the period of paid administrative leave described above and subsequent to the termination of Gilley’s employment on December 31, 1996, Gilley will be eligible for his normal share of any intellectual property payments under [the SRI awards] policy in force on July 1, 1996, as it applies to currently *1217 active. employees. Gilley acknowledges that the period of paid administrative leave through December 31, 1996, and the offer of outplacement services and use of an office and full royalty sharing represent separate and additional consideration over and above that to which he would otherwise be entitled to receive as an employee or former employee of [SRI].”
It appears that Gilley thereafter completed the period of-administrative leave and left SRI’s employment. In a March 2013 deposition given in connection with this case, Gilley estimated that he' had received somewhere between $900,000 and $1,000,000 from SRI - under the SRI awards policy, the “vast majority” of it after he left SRI at the end of December 1996.
On January 1, 2006, SRI, a nonprofit corporation, spun off Brookwood,’ a wholly owned subsidiary, for the purpose of managing'and developing SRI’s drug-delivery unit as a for-profit business. As part of this spin-off, SRI transferred all aspects of its drug-delivery unit to Brookwood, i.e., real estate, employees, continuing contracts and customers, and intellectual property, including the '609 patent. The asset-transfer agreement setting forth the terms of the spin-off further provided that Brookwood would assume liability for “all amounts payable to employees or former employees of [SRI] as a result of revenues received by Brookwood ... in respect of the intellectual property,” and, in an accompanying document governing the transfer of. intellectual property, Brook-wood explicitly acknowledged “the right of certain current and former employees of [SRI] to share in the revenues generated by certain intellectual property, in accordance with certain existing policies of [SRI].” On a schedule attached to this document, the separation agreement was specifically noted as granting Gilley such third-party rights. Thereafter, Brook-wood made, and Gilley accepted, payments attributable to the '609 patent.
On July 31, 2007, SRI executed an agreement (“the stock-purchase agreement”) with SurModics pursuant to which SurModics purchased 100% of SRI’s stock in Brookwood for $40 million, with the possibility of SRI’s later receiving up to an additional $22 million if certain milestones were met. Section 7.13 of the stock-purchase agreement specifically discussed the continuing payment of royalties to those current and former employees of SRI and Brookwood who were entitled to such payments and divided the responsibility for those payments between SRI and Brook-wood as set forth in schedules attached to the stock-purchase agreement. The parties do not dispute that the stock-purchase agreement obligated Brookwood and/or SurModics to pay Gilley any income attributable to the '609 patent to which he was entitled under the separation agreement; however, in October 2009 and October 2010, SurModics entered into two agreements pursuant to which it licensed intellectual property, including the '609 patent, and for which it received payments of $3.5 million and $250,000, respectively, but it appears that no funds were remitted to Gilley in connection with those transactions at that time,
On April 27, 2009, Gilley sued SRI in the Jefferson Circuit Court alleging that he had not been paid all the sums he was due under the separation agreement and specifically asserting claims of breach of contract, breach of fiduciary duty, negligence, and suppression.[1] Gilley subsequently *1218 amended his complaint in July 2009 and again in May 2011 to add Brookwood and SurModics as defendants, and to assert third-party-beneficiary claims based on the various documents effecting the Brook-wood spin-off and SurModics purchase, as well as additional conversion, fraudulent-suppression, and conspiracy claims. Following the conclusion of the discovery process, Gilley moved for a partial summary judgment, Brookwood and SurModics moved for a partial summary judgment, and SRI moved for a summary judgment as to all claims.
On April 7, 2014, the trial court entered an order resolving the outstanding summary-judgment motions. With regard to Gilley’s claims against SRI, the trial court denied Gilley’s motion and granted SRI’s motion, thereby entering a summary judgment for SRI on all the claims asserted by Gilley against SRI. With regard to Gilley’s claims against Brookwood and SurModics, the trial court granted all the parties’ summary-judgment motions in part, effectively holding that all of Gilley’s claims were dismissed except for his third-party-beneficiary claims. The trial court further held that it was undisputed that Brookwood and SurModics owed Gilley some amount based on the October 2009 and October 2010 licensing agreements involving the '609 patent but that the exact amount owed would need to be determined at trial. However, before a trial on that issue could be held, Gilley reached a settlement agreement with Brookwood and SurModics, and, on July 7, 2014, the trial court dismissed all remaining claims, thus rendering the April 7 summary judgment entered in favor of SRI a final judgment subject to appeal. The next day, Gilley filed his notice of appeal to this Court.
II.
We review a summary judgment pursuant to the following standard:
“This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala.Code 1975, § 12-21-12.”
Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala.2004).
III.
In its order resolving the summary-judgment motions, the trial court explained its rationale:
*1219 “[Gilley] base[s] [his] claims primarily on an SRI policy by which ‘intellectual property income’ received by SRI was to be shared with those who fall within the definitions of ‘inventors’ and ‘contributors.’ Based on [a] contract[ ] that [Gilley] signed while employed at SRI, [he] argue[s] that [he] is entitled to some of the revenue generated by SRI’s sale of its subsidiary, Brookwood, to SurModics in 2007.
“The court agrees with the defendants that the sale of Brookwood in 2007 did not generate any ‘intellectual property income’ that would impose an obligation to pay [Gilley]. The 2007 transaction involved SurModies’s purchase of the capital stock of Brookwood from SRI. Both before that transaction and after, Brookwood owned the intellectual property at issue here. The court further agrees with SRI’s characterization of a stock sale as involving a change of ownership rather than a transfer of any assets, such as patents.
“The September 1994 version of SRI’s' Royalty Awards Policy starts by declaring that ‘if [SRI] derives intellectual property income from patents or inventions which it own[s], it will share such income with the inventor(s) and other [contributors],...’ The 2007 transaction does not fall within this obligation. In 2007, SRI derived income from the sale of stock of a subsidiary — all agree that the transaction did not involve any revenue directly generated from intellectual property owned by SRI. While assets of Brookwood, such as its [intellectual property], may well have factored into a determination of a fair purchase price, such an indirect effect of the [intellectual property] at issue may not fairly be read into this Policy.
“A much closer -question is actually presented by SRI’s 2005 spin-off of Brookwood. At that time, it conveyed its intellectual property at issue to Brookwood in exchange for stock in the new subsidiary. In his response to SRI’s summary-judgment motion, Gilley argues, ‘[alternatively, SRI had an obligation to share stock with Gilley when it transferred the '609 patent, and other assets and patents to Brookwood in 2005 and received 100% of Brookwood Stock in exchange.’ The problem here -is that there is no claim in [Gilley’s] complaint, as amended, to this effect. Rather, [Gil-ley] argue[s] that [he was a] third-party beneficiar[y] under the ‘Brookwood Spin-Off Agreements,’ entitled to continued intellectual property income from Brookwood. Further, there is evidence that Brookwood did make some royalty payments to [Gilley] after 2005, which [Gilley] apparently accepted without protest of anything further owed.
“In any event, the court finds in favor of the defendants on [Gilley’s] claims seeking damages referable to the purchase of Brookwood by SurModics. [Gilley] [is] not entitled to any portion of revenue that SRI received in that transaction. Further, the court finds no evidence supporting a claim that SRI or Brookwood underpaid [Gilley] referable to licensing revenues received before the sale of Brookwood to SurModics. With this finding, there is no basis for any claim against these defendants. Since the defendants had no contractual obligation to share revenues resulting from the 2007 transaction, they had no duty to disclose anything in connection with that transaction, and there can be no actionable conspiracy.”
(Emphasis added.) On appeal, Gilley does not dispute the trial court’s conclusion that no evidence had been identified indicating that SRI or Brookwood underpaid Gilley with respect to licensing revenues at any time before Brookwood was sold to Sur- *1220 Modics. Rather, Gilley’s arguments to this Court are that SRI was obligated to share 'with him some portion of the payment SRI received 1') when the '609 patent was transferred to Brookwood at the time Brookwood began operations in January 2005 and/or- 2) when SurModics purchased all of 'SRI’s stock in Brookwood in July 2007. For the reasons explained by the trial court, we disagree.
The trial court did not provide an in-depth analysis of Gilley’s claim,’ made in his response to SRI’s summary-judgment motion, that he should have been given some stock in Brookwood when the '609 patent was transferred to it in January 2005; rather, thes trial court noted that the first time Gilley had asserted this claim was in his response to SRI’s summary-judgment motion and held that, because the claim had not been asserted in his original complaint or the two subsequent amendments to the complaint, the claim was not properly before the court. Gilley argues in response that Alabama is a notice-pleading state and that his complaint as amended was sufficient to puf SRI on notice that he was claiming an entitlement to a portion of the Brookwood stock SRI received when Brookwood was spun off, even though he did not specifically articulate that argument. See, e.g., Weaver v. American Nat’l Bank, 452 So.2d 469, 473 (Ala.1984) (“Our rules of civil procedure require only notice pleading, Dempsey v. Denman, [442 So.2d 63 (Ala.1983) ]; Rule 8(a), A[la]. R. Civ. P. Strict rules of technicality and form may be disregarded. A[la]. R. Civ. P. 8, Committee Comments. A complaint is sufficient if it puts the defendant on notice of the actions against which it must defend.”). We accordingly must review Gilley’s complaint to determine if it reasonably put SRI on ndtice that Gilley was claiming some portion of the stock SRI received in the Brookwood spin-off. Gilley’s complaint, as amended, stated, in relevant part:
“13.' In January 2005, SRI ‘spun off its drug delivery group into a new, for-profit corporation, Brookwood Pharmaceuticals, Inc. By far, the most significant asset transferred by SRI to Brookwood was the intellectual property associated with the drug delivery group. Gilley was an inventor or co-inventor ... with respect to most of that' intellectual property.
“14. SRI entered into an asset transfer agreement with Brookwood in which Brookwood purported to ‘assume and agree to discharge’ certain liabilities and obligations of SRI, ' including ‘all amounts payable to employees or former employees ... as a result of revenues received by Brookwood ... in respect of the intellectual property’ transferred to Brookwood.
“15. Brookwood was initially a wholly-owned subsidiary.of SRI. On or about July 31, 2007, SRI entered into a stock purchase agreement with SurModics, .Inc. (‘SurModics’) by which SurModics purchased from SRI all of the outstanding capital stock of Brookwood. The purchase price was $40 million in cash up front at closing, with the potential for an additional $22 million in future cash payments upon achievement of certain milestones. On information and belief, one or more of the milestone payments have now been made to SRI.
“16. Although Gilley ... [is] entitled to a significant portion of the foregoing payments made by SurModics to SRI, in accordance with the above-referenced agreements, SRI and Brookwood have failed and refused to pay Gilley ... the amounts due [him].
“17. Additionally, SurModics and Brookwood may have entered into contractual arrangements or may in the *1221 future enter into contractual arrangements which will result in income derived from intellectual property as to which Gilley had defined rights as an inventor or co-inventor— [Gilley] [is] entitled to [his] contractual share of that intellectual property income.

“Count One: Breach of Contract

“18. [Gilley] incorporate^] the foregoing paragraphs of the complaint.
“19. [Gilley] ha[s] fulfilled all of [his] obligations under the referenced agreements.
“20. Defendants have breached the agreements by failing to pay [Gilley] the agreed amounts of intellectual property income.
“21. To the extent that Brookwood has assumed SRI’s obligation to [Gilley] and to the extent that the assumption of obligations is enforceable and binding on [Gilley], Brookwood has breached its obligations to [Gilley] by failing-to pay the agreed amounts of intellectual property income owed to [Gilley].”
In his brief to this Court, Gilley argues that this “was more than adequate to place SRI on notice that Gilley was claiming relief based on the spinoff of Brookwood in 2005.” Gilley’s brief, p. 17. He further specifically references paragraphs 18 and 20 and states:
“Thus, Gilley did, in fact, plead the claim based on the 2005 stock spin-off. It is true that Gilley did not specifically say in the complaint, or amended complaint, that he was entitled to ‘stock’ from the spin-off. But he did not have to specify ‘stock’ (or ‘cash’ or ‘warrants’ or ‘equity’). All Gilley had to do was lay out the facts arid state his claim that he was entitled to intellectual property income owed — payments which could take any form. He did so.”
Gilley’s brief, p. 18. We disagree that Gilley’s complaint would have put SRI on notice that Gilley was- claiming income based on the January 2005 spin-off of Brookwood. Although his complaint does allege as facts that Brookwood was both spun off in January 2005 and then sold in July 2007, it does not assert that Gilley was entitled to any income based on the January 2005 transaction, although it does affirmatively state that he was “entitled to a significant portion of the foregoing payments made by SurModics to SRI” in connection with the July 2007 transaction. The express articulation of a claim that income was owed on the July 2007 transaction — while omitting any similar claim with regard to the January 2005 transaction— would, rather than put SRI on notice that there was a claim .of income owed based on the January 2005 transaction, indicate to SRI that no such claim was being asserted.
This conclusion is buttressed by the fact that Gilley made no mention of the purported claim that income was owed him as a result of the January 2005 Brookwood spin-off until his response to SRI’s summary-judgment motion. Notably, Gilley did not at any time before that put forth any evidence relating to an essential elément of such a claim — his damages — and the expert he retained to prove his damages in this case, in the report he submit-' ted to the trial court, calculated damages associated only with 1) SurModics’ purchase of Brookwood in July 2007 and 2) the October 2009 and October 2010 licensing agreements entered into by SurMod-ics. Although the failure to submit any evidence of damages is, alone, an insufficient basis for entering a summary judgment on a breach-of-contract claim, Brooks v. Franklin Primary Health Center, Inc., 53 So.3d 932, 936 (Ala.Civ.App.2010), that failure is relevant in this case inasmuch as it indicates that Gilley never asserted a claim that income' was owed him as. a result of the. January 2005 spin-off of *1222 Brookwood. If Gilley had asserted such a claim in any version of his complaint, he presumably would have made some effort to establish the damages he claimed in association with that claim, especially when he had retained an expert witness for the sole purpose of establishing damages.
In sum, the touchstone in determining if a claim has been sufficiently asserted in a complaint is whether the complaint puts the defendant on notice of the claim or action against which it must 'defend. Weaver, 452 So.2d at 473. In this case, Gilley’s complaint undisputedly put SRI on notice of several claims against which it was required to defend itself; however, a claim that Gilley was entitled to some portion of the Brookwood stock SRI received when Brookwood was spun off in January 2005 is not among those claims. To the contrary, “there was virtually no way for the defendant to be put on notice” that Gilley was asserting such a claim based on the language of the complaint and Gilley’s actions up until his response to SRI’s summary-judgment motion. Phelps v. South Alabama Elec. Co-op, 434 So.2d 234, 237 (Ala.1983). Accordingly, we affirm the judgment of the trial court inasmuch as it relates to any claim made by Gilley based on events before the July 2007 deal.
Gilley’s next argument is that the trial court erred by entering a summary judgment in favor of SRI on his claim that SRI realized intellectual-property income based on the '609 patent when it sold all of its stock in Brookwood to SurModics in July 2007 and that he was therefore entitled to some portion of that income based on the terms of the separation agreement and the SRI awards policy. As noted in the trial court’s order quoted above, it rejected this argument, holding that “the sale of Brookwood in 2007 did not generate any ‘intellectual property income’ that would impose an obligation to pay [Gil-ley].” We agree.
When SRI transferred the '609 patent to Brookwood in January 2005, it transferred its entire interest in the patent, relinquishing any further claim to benefit from it. Thus, any future income derived from the '609 patent — whether by sale or license — would inure to the benefit of Brookwood, not SRI; in effect, SRI agreed in January 2005 to trade any future income that might be derived by the '609 patent in exchange for present income in the form of Brookwood stock. Thus, because' SRI terminated its ownership of the '609 patent in January 2005, it could not “derive” any future income from it, and, accordingly, Gilley was owed no additional compensation under the SRI awards policy when SRI subsequently sold its Brook-wood stock in July 2007.
In his brief to this Court, Gilley disputes this reasoning, arguing:
“In 1996, when Gilley left SRI, SRI owned the '609 patent. On August 1, 2007, after the sale of Brookwood closed, SRI pocketed $40 million (with $22 million more in future contingent consideration) and was no longer the ultimate owner of the '609 patent. The fact that SRI put those patents in the corporate shell of Brookwood nine years after Gil-ley’s agreement was entered into is of no consequence, as SRI was the ultimate owner of the patents at issue because it owned Brookwood. After Brookwood was sold to SurModics, SurModics became the ultimate owner of those patents because it was the owner of Brook-wood.
“In other words, SRI made income that without question was at least in part ‘derive[d] from! the '609 patent and other intellectual property in which Gilley had an interest. Accordingly, *1223 SRI has an obligation to share that income with Gilley.”
Gilley’s brief, pp. 21-22. However, Gilley’s argument that SRI was still “the ultimate owner” of the '609 patent even after it was transferred to Brookwood is not supported by Alabama law, which holds, to the contrary, that shareholders in a corporation are not owners of the corporation’s property. As explained by this Court in Warrior River Terminal Co. v. State, 257 Ala. 208, 211, 58 So.2d 100, 101 (1952):
“It is firmly established by the authorities that a corporation is a distinct entity: that it is separate and distinct from its shareholders, and that the property representing its capital is vested in and owned by the corporation and not the shareholders.
“In the case of Moore & Handley Hdw. Co. v. Towers Hdw. Co., 87 Ala. 206, 6 So. 41, 43 [ (1889) ], the foregoing principle was stated as follows:
“‘The general doctrine is well established, and obtains both at law and in equity, that a corporation is a distinct entity, to be considered separate and apart from the individuals who compose it, and is not to be affected by the personal rights and obligations and transactions of its stockholders, and this whether said rights accrued or obligations were incurred before or subsequent to incorporation.’
“And in the case of First National Bank of Gadsden v. Winchester, 119 Ala. 168, 24 So. 351, 352 [(1898)], it was said:
“ ‘ “The courts of law, however, ... recognize a corporation only as one body acting in the corporate name. The individual stockholders are not, in contemplation of law, parties to contracts made by the association in a corporate capacity, nor have they any legal right or title to property vested in the corporation. At law, a corporation and its stockholders are considered as distinct from each other.... [Quoting Morawetz on Private Corporations, § 381].”
“ ‘The principle here stated, that the legal title to the property of the corporation is in the corporation itself, and not the shareholders, cannot, of course, be questioned: and the authorities, for the most part, go so far as to hold that, even when the body ceases to be an association of persons by reason of the concentration of all the stock in the hands of one owner, the corporation is not thereby dissolved, and the sole stockholder does not thereby become legal owner of the property.’
“To the same effect are the decisions of the Supreme Court of the United States.”
(Emphasis added.) See also Martin Truck Line, Inc. v. Alabama Tank Lines, Inc., 261 Ala. 163, 166, 73 So.2d 756, 759 (1954) (“It is elementary that a corporation is for ... most purposes an entity distinct from its stockholders. By its very nature the corporate property is vested in the corporation itself and not in the stockholders.”). Thus, SRI was not the owner of the '609 patent when it sold Brookwood to SurModics in July 2007, and the income it realized from that sale came solely from its ownership of Brookwood stock, not from any ownership of or rights to the '609 patent.[2]
*1224 In conclusion, Gilley has stated in his brief to this Court that “either SRI had an obligation to share Brookwood stock with Gilley when it transferred the '609 patent to Brookwood and was issued that stock, or it had an obligation to share the income that was received when it dispossessed itself of that stock (and the '609 patent) in 2007.” Gilley’s brief, p. 24. However, as explained supra, Gilley did not assert a claim in his complaint based upon the January 2005 Brookwood spin-off. Thus, although the trial court correctly recognized that Gilley might have at one time had a plausible claim in connection with the January 2005 transaction that would have presented a “closer question” for the court, because that claim was not properly asserted, it was, and is, unnecessary to consider its merits. We can, however, unequivocally state that there is no merit to Gilley’s claim that he was entitled to some portion of the $40 million received when SRI sold its Brookwood stock to SurMod-ics because that income was derived from the sale of stock, not from “patents or inventions which [SRI] own[ed],” which would have implicated the SRI awards policy. In fact, SRI did not own any patents conveyed to SurModics in the July 2007 transaction; any patents involved were owned by Brookwood both before and after the transaction.[3]
IV.
Gilley appealed the summary judgment entered against him and in favor of SRI on his claims that SRI did not pay him money he alleged he was owed pursuant to the separation agreement and the SRI awards policy after Brookwood was spun off in January 2005 and then again when Brook-wood was sold to SurModics in July 2007. However, because Gilley did not timely assert a claim based on the January 2005 transaction in his complaint and because the money received by SRI in the July 2007 transaction was not intellectual-property income subject to sharing under the SRI awards policy, the summary judgment entered by the trial court was proper and is hereby affirmed.
AFFIRMED.
MOORE, C.J., and PARKER, SHAW, and WISE, JJ., concur.

. Gilley was joined in his lawsuit by Herbert M. Blatter, another former SRI employee who similarly maintained that he was due additional intellectual-property income for his *1218 contributions toward developing and commercializing certain SRI patents or inventions. The trial court eventually entered a summary judgment against Blatter on his claims as well. Although Blatter was listed as a co-appellant on the notice of appeal filed by Gilley, Blatter thereafter informed this Court that he was not pursuing an appeal and, on January 8, 2015, he was dismissed from this appeal. It is accordingly unnecessary to discuss any facts or arguments relating to Blat-ter’s specific claims.

. We further note that no evidence indicates that the transfer of the '609 patent to Brook-wood was a sham transaction or that SRI simply used the corporate shell of Brookwood in an attempt to avoid paying Gilley any further income under the separation agreement and the SRI awards policy. It is undisputed that SRI received Brookwood stock in ex *1224 change for a package of assets including the '609 patent and that this stock, by July 2007, had risen in value to at least $40 million. Moreover, the terms of the documents effecting the Brookwood spin-off specifically protected Gilley's rights to receive future compensation based on future commercialization of the '609 patent.

. Gilley has also argued that the summary judgment entered on his fraudulent-suppression claim should be reversed; however, as the trial court noted, if SRI had no contractual obligation to share with Gilley revenue from the July 2007 sale of Brookwood, it similarly had no duty to disclose anything in connection with that transaction. See, e.g., Nesbitt v. Frederick, 941 So.2d 950, 955 (Ala.2006) ("An essential element of ... [a] fraudulent-suppression claim[] is a duly to disclose.”).