Rel: July 19, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2024

_____

## CL-2023-0615

_____

## W.C.M.

### v.

## M.P.

## Appeal from Baldwin Juvenile Court
## (JU-19-510.02)

EDWARDS, Judge.

In July 2021, M.P. ("the mother") filed in the Baldwin Juvenile Court ("the juvenile court") a petition seeking to terminate the parental rights of W.C.M. ("the father") to E.H.P. ("the child"), who had been conceived outside of wedlock. After a trial held over four sessions in

August 2021, September 2021, and July 2023, the juvenile court entered

a judgment terminating the father's parental rights. The father filed a

postjudgment motion directed to that judgment that the juvenile court

denied. The father then filed a timely notice of appeal to this court.

> "[W]hen one parent seeks to terminate the other parent's parental rights, a 'finding of dependency' is not required, and the trial court should determine whether the petitioner has met the statutory burden of proof and whether that termination is in the child's best interest, in light of the surrounding circumstances.
>
> "The two-prong test that a court must apply in a parental rights termination case brought by a custodial parent consists of the following: First, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in [Ala. Code 1975, § 12-15-319(a)]. Second, after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered. …
>
> "Once the court has complied with this two-prong test -- that is, once it has determined that the petitioner has met the statutory burden of proof and that, having considered and rejected other alternatives, a termination of parental rights is in the best interest of the child -- it can order the termination of parental rights."

Ex parte Beasley, 564 So. 2d 950, 954-55 (Ala. 1990) (emphasis added).

The record reflects that the mother filed a paternity and child-

support action in 2015, shortly after the child was born. During that

2

action, which was still pending at the time of the entry of the termination-of-parental-rights judgment,[1] the parties had twice operated under different temporary agreements setting out the father's right to visit with the child, one of which required the father to pay certain sums to the mother for child support. During the pendency of the paternity and child-support action, the father filed motions seeking to compel the mother to allow him the visitation that was set out in the temporary agreements, and, in two separate orders in 2017, the juvenile court required the mother to take appropriate actions to permit the father to exercise his

---

[1]The paternity and child-support action was continued multiple times for various reasons and was apparently stayed because the father had filed for bankruptcy protection and again when the father's bankruptcy action was reportedly "reopened." However, the automatic stay that becomes effective upon the filing of a petition for bankruptcy does not operate as a stay

> "(A) of the commencement or continuation of a civil action or proceeding --
>
> "(i) for the establishment of paternity;
>
> "(ii) for the establishment or modification of an order for domestic support obligations; [or]
>
> "(iii) concerning child custody or visitation ...."

11 USCA § 362(b)(2)(A).

visitation. The record indicates that the father exercised the visitation that he was provided in the temporary agreements. However, as of the time of the filing of the termination-of-parental rights action, no agreement or order of the juvenile court provided visitation rights to the father or governed child support. The mother had filed a previous termination-of-parental-rights action in 2019 but the juvenile court declined to terminate the father's parental rights at that time.

The mother testified that, after the 2019 termination-of-parental-rights action was concluded in November 2019, she had made efforts to provide opportunities for the father to visit with the child. She explained that she had arranged for the father to see the child each Thursday by picking up the father so that she, he, and the child could have dinner at a restaurant together.[2] Although the mother said that the father had initially participated in the mother's attempts to provide opportunities for him to visit the child, she said that later he began requesting that some of the visits be rescheduled. She testified that she had attempted to accommodate the father's requests. According to the mother, in January 2020, the father informed her that he was unable to visit

---

[2]The father does not drive because of problems with his vision.

4

because he had begun working in Florida. The mother said that she had offered to take the child to visit the father in Florida in January 2020 but that he had declined her offer because he had the flu. The mother testified that, at some point in or after January 2020, she would drop the child off at the home of the father's parents ("the paternal grandparents") on Thursday evenings so that the father could visit and have dinner with the child.

According to the mother, after the father began working in Florida, he had informed her that she could come and pick the child up an hour early from some of the Thursday visits at the paternal grandparents' house because, she said, he had told her that he had to return to Florida. She testified that the father had declined a visit on March 19, 2020, because, she said, he had told her that he feared that he had been exposed to the virus that causes "COVID-19." She said that he had not visited the child in April 2020 or May 2020; however, she indicated that the father had spoken to the child via FaceTime, a videoconferencing application, on April 1, 2020, and April 4, 2020. She testified that the father had texted her on May 8, 2020, but, she said, he had not asked about the child or requested a visit at that time. The mother further

5

testified that the father had contacted her about the child's dance recital in late June 2020, but, she said, he had ultimately decided that he could not attend. She said that he had telephoned her to arrange to FaceTime with the child on July 1, 2020, the date of the child's birthday, but, the mother explained, he had not completed the FaceTime call at the arranged time because he had instead texted her about some information relating to a recent filing in the pending paternity and child-support action. The mother testified that the father had not made any further attempt to contact the child until she filed the termination-of-parental-rights action in 2021.

The mother testified that she had also begun allowing the child to visit regularly with the paternal grandparents on Sundays. The mother further testified that the child had seen the father during a visit with the paternal grandparents in August 2020 and that the father had engaged in a FaceTime call with the child during a visit with the paternal grandparents in January 2021. The mother described the child as having been "upset" after both contacts with the father. Regarding the August 2020 visit, the mother stated that she herself had been upset because she had not been able to "prepare [the child] for that" and described the child

6

as having been "confused" and "upset" because, the mother testified, "[the child] wanted to just go over and play with [the paternal grandmother]." The mother stated that "[the child] was upset [in January 2021] because you can't just dip out on somebody for months and then just FaceTime them, you know." As a result of the father's attempt to contact the child when she was visiting with the paternal grandparents in January 2021, the mother testified that she had ended the child's Sunday visits with them because of what she described as her "mistrust."

The mother also testified that the father had not been paying child support. She said that he had paid $600 per month over four months in 2020. She also complained that he had neither paid for any portion of the child's noncovered medical expenses nor funded the child's extracurricular-activity expenses, which, she said, included expenses for dance classes, cheer camp, and art camp.

The father testified that he had willingly paid some unspecified amount of child support in both 2020 and 2021 but admitted that he had not paid any money to the mother in 2022 or 2023. He said that he had paid the child support specified in the 2017 temporary agreement entered

7

in the paternity and child-support action. He further testified that the mother had never sent him any medical bills or other bills for him to pay.

On the last day of the trial, the father testified that he was not employed full time and was seeking disability. He said that he does odd jobs for friends to make ends meet and that he lives in a room in a house owned by a friend in Gulf Breeze, Florida, and does not pay rent. He also testified that he regularly travels back and forth between Florida and his parents' house in Alabama.

The father explained that the mother had not followed the parties' earlier agreements relating to visitation made in the paternity and child-support action. He described the mother as being amenable to visitation but only on her own terms. He said that the mother "got nasty" after certain filings were made in the paternity and child-support action in July 2020 and that he "just walked away and said I'll wait for court." He also commented that he had decided not to pay any amount for the support of the child because the mother had not allowed him to visit.

On appeal, the father argues that the mother failed to establish that he had abandoned the child or that all viable alternatives to the termination of his parental rights were exhausted. He also relies on the

8

following statement from <u>Ex parte J.E.</u>, 1 So. 3d 1002, 1013 (Ala. 2008) (Cobb, C.J., concurring specially) (quoting <u>A.J.H.T. v. K.O.H.</u>, 983 So. 2d 394, 407 (Ala. Civ. App. 2007) (Moore, J., concurring in part and dissenting in part)): "Courts of this State have often found that 'termination of parental rights is not appropriate in cases ... in which the children are safely residing with the custodial parent and the continuation of the noncustodial parent's parental rights does not present any harm' to the children's best interests. ....'"  In his reply brief, he expands that argument, relying on this court's opinion in <u>W.W. v. H.W.</u>, 384 So. 3d 663, 670 (Ala. Civ. App. 2023), in which we explained that, even when a noncustodial parent has abandoned a child, a "juvenile court [is] still required to consider whether the termination of [that parent's] parental rights would serve the child's best interest."

The appellate courts of this state have, in the past, been reluctant to affirm the termination of a noncustodial parent's parental rights when the child was residing safely in the home of the custodial parent.  <u>See</u>, <u>e.g.</u>, <u>Ex parte Brooks</u>, 513 So. 2d 614 (Ala. 1987), overruled on other grounds by <u>Ex parte Beasley</u>, 564 So. 2d 950 (Ala. 1990); <u>S.M.M. v. R.S.M.</u>, 83 So. 3d 572 (Ala. Civ. App. 2011).  Moreover, our appellate

9

courts have often repeated that termination of parental rights should not be accomplished to satisfy the desires of one or both of the child's parents. Ex parte Brooks, 513 So. 2d at 617; S.D.P. v. U.R.S., 18 So. 3d 936, 939 (Ala. Civ. App. 2009). Our supreme court has explained that, "[w]hen a child's welfare is threatened by continuation of parental rights, the law provides a means for terminating those rights." Ex parte Brooks, 513 So. 2d at 617. Thus, termination of parental rights should be confined to those cases in which "the most egregious of circumstances" warrants such action. Ex parte Beasley, 564 So. 2d at 952.

> "'"[T]he termination of parental rights is a drastic measure, and we know of no means by which those rights, once terminated, can be reinstated. The evidence in [this] case[] 'does not rise to the level of being so clear and convincing as to support termination of the parental rights of the [father], such action being the last and most extreme disposition permitted by statute.'"'"

Ex parte A.S., 73 So. 3d 1223, 1230 (Ala. 2011) (quoting D.O. v. Calhoun Cnty. Dep't of Hum. Res., 859 So. 2d 439, 445 (Ala. Civ. App. 2003), quoting in turn V.M. v. State Dep't of Hum. Res., 710 So. 2d 915, 921 (Ala. Civ. App. 1998)).

With those principles in mind, we agree with the father that the juvenile court's judgment terminating the father's parental rights must

10

be reversed. The mother presented no evidence indicating that the child's best interest would be served by terminating the father's parental rights. See W.W., 384 So. 3d at 671. Although the mother testified that the child was "upset" and "confused" due to the sporadic visitation with the father, the mother failed to elaborate on the effects of the father's behavior on the child's overall well-being. In fact, other than the vague statements regarding the child's confusion and being upset after certain visits, "[t]he mother presented no evidence regarding whether the father's abandonment of the child had caused the child mental distress," and "[n]either party presented evidence concerning the nature of the relationship between the father and the child or how the father's intermittent contact with, and abandonment of, the child had impacted the child." W.W., 384 So. 3d at 671. The mother's testimony indicated that the child had enjoyed visits with the paternal grandparents, but the mother terminated those visits when the father had attempted to contact the child during a January 2021 visit without the mother's foreknowledge and approval because, the mother said, she had been upset about the father's attempt to contact the child and because of her "mistrust" of the paternal grandparents for allowing the father to contact the child. Not

11

only does the judgment terminating the father's parental rights deprive the child of a legal father, see W.W., 384 So. 3d at 671, but it also deprives her of a relationship with the father's family.

In light of our conclusion that the juvenile court's judgment is not supported by evidence indicating that termination of the father's parental rights would serve the child's best interest, we need not examine whether the evidence was sufficient to support the juvenile court's conclusion that the mother proved grounds for the termination of the father's parental rights. See L.M.W. v. D.J., 116 So. 3d 220, 223 (Ala. Civ. App. 2012) (indicating that this court may pretermit consideration of other issues raised on appeal when our resolution of one issue is dispositive of the appeal). However, as we stated in W.W., "[t]he holding in this opinion is not meant to condone the behavior of the father," 384 So. 3d at 671, which, in the present case, certainly does not appear to include significant and sustained efforts to claim and exercise his rights as a parent or to perform the duties of a parent. Nonetheless, because the record lacks evidence indicating that the child's best interest would be served by terminating the father's parental rights, we reverse the

judgment of the juvenile court, and we remand the case for the entry of a judgment consistent with this opinion.

REVERSED AND REMANDED.

Moore, P.J., concurs specially, with opinion.

Lewis, J., concurs in the result, without opinion.

Fridy, J., dissents, with opinion, which Hanson, J., joins.

MOORE, Presiding Judge, concurring specially.

I concur that the judgment of the Baldwin Circuit Court ("the juvenile court") should be reversed because the record lacks evidence indicating that it would advance the best interests of the child. I write specially to note that Rule 28(a)(10), Ala. R. App. P., is not, and should not be, inflexibly applied to prevent this court from considering issues impacting the rights, interests, and welfare of the children before the court in appeals from judgments terminating parental rights.

Rule 28(a)(10) provides that the brief of an appellant shall include "[a]n argument containing the contentions of the appellant ... with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." In Ex parte Borden, 60 So. 3d 940, 943 (Ala. 2007), our supreme court explained that Rule 28(a)(10), which requires legal argument with citation to authorities, is intended "to conserve the time and energy of the appellate court and to advise the opposing party of the points he or she is obligated to make." If an appellate brief adequately frames the issue presented in the appeal so that the appellate court and the opposing party can discern the argument being made against the judgment, the

failure to cite "an abundance of legal authority" does not result in waiver of the issue under Rule 28(a)(10). Roberts v. NASCO Equip. Co., 986 So. 2d 379, 383 (Ala. 2007). In fact, our supreme court has held that, under the foregoing circumstances, the appellate courts of this state can review the merits of an appeal even when no legal authority has been cited. Kirksey v. Roberts, 613 So. 2d 352, 353 (Ala. 1993) (holding that noncompliance with Rule 28 may be excused when the appellate court is "able to adequately discern the issue [the appellant] presents, in spite of his failure to present authorities in support of his claim").

In the "argument" section of his opening brief, W.C.M. ("the father") quotes the following passage from Chief Justice Sue Bell Cobb's special concurrence in Ex parte J.E., 1 So. 3d 1002 (Ala. 2008):

> "Courts of this State have often found that 'termination of parental rights is not appropriate in cases ... in which the children are safely residing with the custodial parent and the continuation of the noncustodial parent's parental rights does not present any harm' to the children's best interests, and that, in many cases, 'a less drastic alternative, usually maintaining the status quo, is viable and should be utilized.'"

1013-14 (Cobb, C.J., concurring specially) (quoting A.J.H.T. v. K.O.H., 983 So. 2d 394, 407 (Ala. Civ. App. 2007) (Moore, J., concurring in part and dissenting in part) (citing Sutton v. Elrod, 724 So. 2d 551 (Ala. Civ.

App. 1998); In re Beasley, 564 So. 2d 959 (Ala. Civ. App. 1990); Miller v. Knight, 562 So. 2d 274 (Ala. Civ. App. 1990); Talley v. Oliver, 628 So. 2d 690 (Ala. Civ. App. 1993); S.M.W. v. J.M.C., 679 So. 2d 256 (Ala. Civ. App. 1996); and Thornton v. Thornton, 519 So. 2d 960 (Ala. Civ. App. 1987))).

That passage delineates that the termination of parental rights is not appropriate when a child is safely residing with a custodial parent who is meeting the child's need for stability and permanency and the noncustodial parent does not present a danger to the safety and welfare of the child. In such cases, the appropriate course is to maintain the status quo by denying the petition for termination of the noncustodial parent's parental rights and leaving the child in the satisfactory care of the custodial parent because the best interests of the child are being adequately served by that parent.

The father did not elaborate further on that point in his opening brief. In her responsive brief, M.P. ("the mother"), relying heavily on C.C. v. L.J., 186 So. 3d 208 (Ala. Civ. App. 2015), argued that the juvenile court had not erred in terminating the father's parental rights because, she said, the juvenile court did not have to consider maintaining the status quo as a viable alternative after finding that the father had

abandoned the child. In his reply brief, the father, citing primarily <u>W.W. v. H.W.</u>, 384 So. 3d 663 (Ala. Civ. App. 2023), responded to the mother's argument by maintaining that, even in cases of abandonment, in which viable alternatives need not be explored, a juvenile court must still find that the termination of parental rights serves the best interests of the child. The father contended, consistent with his citation to Chief Justice Cobb's writing in <u>Ex parte J.E.</u>, that the termination of his parental rights was not appropriate because the child can safely reside with the mother and the continuation of his parental rights does not threaten the child's security, stability, and permanency interests, noting that the termination of his parental rights was not being accomplished to facilitate the adoption of E.H.P. ("the child") by another man.

Even considering the father's citation to Chief Justice Cobb's writing in <u>Ex parte J.E.</u> in his opening brief in complete isolation, it is apparent that the father was arguing that termination of his parental rights was inappropriate because it was in the best interests of the child that the custodial status quo continue. The mother understood that argument because she responded to it by asserting that termination of the father's parental rights was appropriate because the juvenile court

17

found that the father had abandoned the child, and the juvenile court did not have to consider maintenance of the status quo as a viable alternative to termination based on that abandonment. The father appropriately countered that argument in his reply brief by responding that, even in cases of abandonment, the juvenile court still had to find that termination served the best interests of the child.

In this case, the main opinion does not create an argument for the father or excuse the father from complying with Rule 28(a)(10). The father at least minimally complied with the rule, but even if he did not, his noncompliance did not prevent the mother from responding to his argument or preclude him from expanding on his point in his reply brief when responding to her argument.

FRIDY, Judge, dissenting.

W.C.M. ("the father") did not argue in his opening brief that M.P. ("the mother") failed to offer clear and convincing evidence that terminating his parental rights was in the best interest of E.H.P. ("the child"). Indeed, nothing he writes in his opening brief even approaches such an argument. Nevertheless, the main opinion creates that very argument for the father. Because I do not think an appellate court should reverse a lower court's judgment on grounds not properly raised to it, and because I conclude that the arguments that the father does properly raise to this court do not warrant reversal, I respectfully dissent.

## I.

In the first paragraph of the argument section of his opening brief, the father sets forth what he calls "general principles." Among those "general principles" is the following quote from Chief Justice Cobb's special concurrence in Ex parte J.E., 1 So. 3d 1002, 1013-14 (Ala. 2008):

> "Courts of this State have often found that 'termination of parental rights is not appropriate in cases ... in which the children are safely residing with the custodial parent and the continuation of the noncustodial parent's parental rights does not present any harm' to the children's best interests, and that, in many cases, 'a less drastic alternative, usually maintaining the status quo, is viable and should be utilized.'"

(Citations omitted.) Nowhere in his initial brief does the father apply this "general principle" about a child's best interest to the facts of this case. And at no point in that brief does he seek a reversal of the judgment of the Baldwin Juvenile Court ("the juvenile court") for any reason related to the evidence regarding the child's best interest. The main opinion all but concedes the father's failure in this regard. When describing the father's arguments on appeal, the main opinion notes only, as to the child's best interest, that the father quoted Chief Justice Cobb's nonbinding, special concurrence quoted above. It points to none of the father's own language setting forth an argument relating to the child's best interest -- because there is no such language in the father's initial brief at which to point.

It is axiomatic that an appellate court will not reverse a lower court's judgment based on an argument that the appellant has not presented in the opening brief. See Boshell v. Keith, 418 So. 2d 89, 92 (Ala. 1982) ("When an appellant fails to argue an issue in its brief, that issue is waived."). No less authority than the United States Supreme Court has explained why:

"In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the

20

principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. To the extent courts have approved departures from the party presentation principle in criminal cases, the justification has usually been to protect a pro se litigant's rights. See Castro v. United States, 540 U.S. 375, 381-383, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003). But as a general rule, '[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.' Id., at 386, 124 S.Ct. 786 (SCALIA, J., concurring in part and concurring in judgment). As cogently explained:

> "'[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties. […]' United States v. Samuels, 808 F.2d 1298, 1301 (C.A.8 1987) (R. Arnold, J., concurring in denial of reh'g en banc).'"

Greenlaw v. United States, 554 U.S. 237, 243-44 (2008) (footnotes omitted).

Despite such well settled law, the main opinion crafts for the father a legal argument, fleshing out a single quotation that he himself described as a "general principle" of law, a principle that he never developed into even a cursory legal argument. In fact, aside from that single general principle, the father never mentions the best interest of the child in his opening brief.

21

In creating an entire legal argument on behalf of the father, the main opinion has failed to adhere to our proper function to serve as arbiters of the law and instead has unfairly taken up the mantle of advocate for one of the parties appearing before us. Not only is this unfair to the mother, the appellee in this case, it is unfair to litigants in any other matter in which an appellate court has identified an issue, but, because that issue was not argued in the appellant's opening brief, has declined to address it. See, e.g., Archer v. America's First Fed. Credit Union, 290 So. 3d 829, 832 (Ala. Civ. App. 2019); S.S. v. Jefferson Cnty. Dep't of Hum. Res., 154 So. 3d 1049, 1052-53 (Ala. Civ. App. 2014); Crews v. National Boat Owners Ass'n Marine Ins. Agency, Inc., 46 So. 3d 933, 942 (Ala. 2010); Davant v. United Land Corp., 896 So. 2d 475, 487 (Ala. 2004); Deutsch v. Birmingham Post Co., 603 So. 2d 910, 911 (Ala. 1992); Boshell v. Keith, 418 So. 2d 89, 92 (Ala. 1982).

Ignoring the guiding principle that precludes us from creating arguments on behalf of a party damages the integrity of this court's role as an impartial arbiter of the cases that come before us. Reversing a judgment on a ground that an appellant has not argued creates uncertainty for future appellees, who may now feel the need to guess

what issues this court might develop on its own initiative. It also places this court in the predicament of determining which future cases are "worthy" of our intercession regardless of what arguments the appellant makes.

The main opinion posits that this court is "reluctant" to affirm a judgment terminating the parental rights of a noncustodial parent when a child is safely residing with the custodial parent. But that is no reason to ignore our job as appellate judges to address only those questions properly raised to us. There is no doubt that cases involving the fundamental rights of parents and the protection and rearing of children are among the most difficult cases that trial courts and appellate courts face. But it is precisely when the stakes are high and the issues weighty that the rules requiring our neutrality and preventing us from advocating for the parties are most important. Of course, the result of tethering ourselves to the arguments that the parties present to us will, on occasion, lead to results that the members of this court will not personally like. But, to paraphrase a well-known quote from former Associate Justice of the United States Supreme Court Antonin Scalia, if we liked all the results we reached, we would indeed be doing our jobs

quite poorly. We would, in effect, be imposing our will on the parties rather than our judgment.

To be sure, as the main opinion points out, the father, in his reply brief, does make the best-interest argument on which the main opinion bases its reversal of the juvenile court's judgment. But this court should never reverse a trial court's judgment based on an argument appearing only in a reply brief, and the main opinion is wrong to do so here. Why? Because, as we have often written, arguments made for the first time in a reply brief, like the father's best-interest argument here, are waived. Huntley v. Regions Bank, 807 So. 2d 512, 516 n.2 (Ala. 2001); see also Verano Alabama, LLC v. Alabama Medical Cannabis Comm'n, [Ms. CL-2023-0831, Apr. 19, 2024] ___ So. 3d ___ (Ala. Civ. App. 2024). Such a rule makes sense in light of the fundamental unfairness to an appellee who, armed with only a single brief sandwiched between the appellant's initial and reply briefs, is unable to respond to arguments raised for the first time in the reply brief. See Magers v. Alabama Women's Ctr. Reprod. Alts., LLC, 325 So. 3d 788, 790 (Ala. 2020) (noting the "unfair advantage" to an appellant were the appellant allowed to make arguments for the

first time in a reply brief, leaving the appellee "without an opportunity to counter" such arguments).

The main opinion's decision to create the father's argument runs afoul of other important and equally well-settled appellate principles as well. For example, an appellate court should not accept the citation of a general principle of law as sufficient legal grounding for an argument urging reversal because "[a]uthority supporting only 'general propositions of law' does not constitute a sufficient argument for reversal." Beachcroft Props., LLP v. City of Alabaster, 901 So. 2d 703, 708 (Ala. 2004) (quoting Geisenhoff v. Geisenhoff, 693 So. 2d 489, 491 (Ala. Civ. App. 1997)). Moreover, even if a general principle of law from a nonbinding special concurrence constituted a statement of an argument, such an "argument" would be insufficient to merit appellate court consideration under our Rule 28(a)(10), Ala. R. App. P., which "requires that arguments in briefs contain discussions of facts and relevant legal authorities that support the party's position. If they do not, the arguments are waived." White Sands Group, L.L.C. v. PRS II, LLC, 998 So. 2d 1042, 1058 (Ala. 2008). Or, as the United States Court of Appeals for the First Circuit has put it: "It is not enough merely to

mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). In short, "we cannot create legal arguments for a party based on undelineated general propositions unsupported by authority or argument." Spradlin v. Spradlin, 601 So. 2d 76, 79 (Ala. 1992). Here, the father's initial brief lacks both authority and argument on the issue on which the main opinion reverses the juvenile court's judgment.

In his special concurrence, Presiding Judge Moore explains that this court should not apply the requirements of Rule 28(a)(10) inflexibly when issues impacting children are involved in the appeal. But that contention fails to confront the reason the main opinion is wrong in this case to reverse the juvenile court's judgment. The point is not that the father has transgressed some rule of procedure, it's that this court has decided to create for him an argument that he did not make and then reverse the juvenile court's judgment based on that argument. Strip Rule 28(a)(10) from our Rules of Appellate Procedure, and the point would still remain: we do not create arguments for parties, we do not look for reasons

on our own to reverse a trial court's judgment, and we do not engage in plain error review.

To be sure, after pointing out that the main opinion has improperly created the argument on which it reverses the juvenile court's judgment, I note additional, rules-based problems with the father's initial brief that the main opinion's approach creates -- such as the failures of the initial brief to contain sufficient legal authority and sufficient argumentation supporting the basis of the main opinion's decision to reverse the juvenile court's judgment. But those failures stem not from the father's decision of how best to argue his case in his initial brief but, instead, from the fact that the main opinion, having created an argument for the father, thereby created the additional requirements that the initial brief support that created argument with legal authority and argumentation, which, of course, the initial brief failed to do.

The special concurrence is wrong to suggest that the mother understood the father to be making a best-interest argument because she responded to the father's viable-alternatives argument by contending, correctly, that a juvenile court need not consider viable alternatives to the termination of a parent's rights when it has found that a parent has

27

abandoned the child. See J.C.L. v. J.B.L., 370 So. 3d 254, 263 (Ala. Civ. App. 2022). There is simply no plausible way one can glean from the mother's brief that she understood the father to be arguing in his initial brief that, even if he had abandoned the child, she still had failed to prove that it was in the child's best interest to terminate his parental rights. Why? Because nowhere in her brief does she address any such argument. Indeed, the father's arguments in his initial brief were quite plain: (1) he did not abandon the child; and (2) there were viable alternatives to the termination of his parental rights. It is in no way "apparent," as the special concurrence posits, "that the father was arguing that termination of his parental rights was inappropriate because it was in the best interests of the child that the custodial status quo continue." W.C.M., ___ So. 3d at ___ (Moore, P.J., concurring specially). If anything, the father's argument in his initial brief focuses only on his own rights, not on the child's best interests. And certainly nothing the mother argued in her initial brief in responding to the father's viable-alternatives argument opened the door to the father's best-interest argument in his reply brief, given that those are two distinct issues. See J.G. v. Lauderdale Cnty. Dep't of Hum. Res., 379 So. 3d 444, 453 (Ala. Civ. App. 2023) (Moore, J.,

concurring specially) (noting the three distinct things a petitioner must prove to support the termination of parental rights: "(1) a ground for termination, (2) that no viable alternative to termination of parental rights exists, and (3) that termination of parental rights is in the best interest of the child"); Ex parte Bodie, 377 So. 3d 1051, 1064, 1067-69 (Ala. 2022) (Parker, C.J., concurring in part and concurring in the result) (explaining that, in determining whether to terminate parental rights, the question of the child's best interest is analyzed separately from the question of whether there are viable alternatives to termination).

In sum, the father did not adequately present an argument to this court in his opening brief regarding whether the termination of his parental rights was in the child's best interest. Therefore, I believe that reversing the judgment on that ground exceeds this court's authority. Instead, I would address, as I do below, the issues that the father properly presented to this court for our review.

## II.

To address the merits of the father's arguments on appeal, it is necessary to include a lengthier recitation of the facts and procedural history than the main opinion sets forth. The child was born in July 2015.

On September 9, 2015, the mother filed an action in the juvenile court seeking to adjudicate the father's paternity and requesting custody and child support. Initially, the mother said, the father denied that the child was his, telling the mother that he had had surgery that rendered him incapable of fathering children. The juvenile court ordered the father to submit to genetic testing, but he failed to appear at the appointed time. The father submitted to the testing after the juvenile court entered an order requiring him to show cause why he should not be held in contempt for his failure to appear for the test as ordered. The results of that test indicated that he was the child's biological father.

On August 17, 2016, after the results of the paternity test were known, the father filed an answer and counterclaim asking the juvenile court to "establish custody of the child, and award him all rights afforded to fathers in accordance with Alabama law," as well as establish a parenting-time schedule that would permit him to develop and maintain a relationship with the child. On January 27, 2021, the juvenile court entered an order adjudicating the father's paternity. As of the entry of the judgment terminating the father's parental rights in this action, the

custody dispute between the mother and the father still had not been resolved.[3]

For reasons discussed later in this dissenting opinion, in June 2019 the mother filed a petition seeking to terminate the father's parental rights to the child on the ground that he had abandoned the child. The juvenile court held a trial in that action and on October 28, 2019, it entered a judgment denying the mother's petition. The mother did not appeal from that judgment.

On July 2, 2021, the mother filed a second petition seeking to terminate the father's parental rights in which she again alleged that the father had abandoned the child. The juvenile court held a trial on the second petition over four days: August 2 and 5, 2021; September 16, 2021; and July 18, 2023. During the trial, the mother testified that, after the juvenile court denied the first petition seeking the termination of the father's parental rights in October 2019, she attempted to reunify or "reconnect" the child with the father. She said that she and the father had agreed that he would have supervised visitation with the child every

---

[3]At the mother's request, the juvenile court placed the custody matter on its administrative docket.

Thursday. The three of them would go to dinner and take walks, and, once the mother became comfortable with the situation, she would leave the child with the father's parents, let the child take part in their family activities, and invite the father's parents and the father to the child's activities, such as a dance recital. She also left the child with the father and his parents on Christmas day in 2019. If the father was unable to make a Thursday visitation as scheduled, the mother said, she would rearrange her schedule so that the father and the child could visit another day. Because the father does not drive, the mother said, she would pick him up for their visits.

In early February 2020, the mother said, the father was working in Florida, so she offered to bring the child to see him there. He declined the offer, telling the mother that he had the flu. The father next visited the child in late February at his parents' house. At about that time, the mother said, the father began sending her text messages saying that he wanted to pay for private school for the child. After the first termination petition was denied, the mother said, the father agreed to pay child support of $600 per month. However, she said, he made only three of those payments and never paid for the child to attend private school.

The father testified that he paid the mother child support "several times, more than once, very often in the beginning." He said that, in accordance with the terms of a temporary order that the juvenile court entered in 2017, he had paid the mother $1,000 a month for four months. He said that the juvenile court had not ordered him to make any additional payments since the 2017 order, which the mother did not dispute. He added that he did not know the specific amount that he had paid in child support. The mother began "playing these games" regarding visitation, he said, so he stopped paying.

The father corroborated the mother's testimony that he had not contributed any money toward the child's medical expenses or activities of which he was aware, such as dance or preschool. However, the father said, the mother had not presented him with any bills for those expenses or activities. The father also acknowledged that he had not paid the mother any money for the child's support or expenses since 2020. He disagreed that failing to support the child financially was punishing the child, saying that the mother did not need his financial support.

The father testified that he could have provided financial assistance for the child, but he did not, because, he said, he "was waiting for [his]

33

day in court, to be honest with you." He said that the mother was making the decisions as to when and where visitations would occur, then stopped bringing the child for visits altogether, "[a]nd[,] when she stop[ped] bringing her, I stop[ped] giving her money."

The evidence indicated that the father did stop seeing and communicating with the child. In mid-March 2020, the mother said, the father sent her a text message saying that he believed he had been exposed to "COVID," so he would not be coming to Alabama to see the child. The mother took the child to visit the father's parents in mid-April 2020, but the father had no contact with the child that month, she said. It is unclear from the record whether the father and the child spoke on FaceTime, a videoconferencing application, in early April. Regardless, in May 2020, the mother said, the father sent her a text about his business, but he did not ask to talk with the child. On June 25, 2020, the father asked the mother for details about the child's upcoming dance recital, but the next day he told the mother that he would not be attending the recital because he was having trouble with his eye. The father had no contact with the child in June 2020 and never asked to see the child that month, the mother said.

34

The child's birthday is in July, and, the mother said, the father told her he would like to speak to the child via FaceTime on her fifth birthday. They arranged for him to contact the child at 3:00 p.m., but he failed to do so, the mother said. However, that afternoon he did send the mother a text complaining of pleadings or documents that her attorney had filed in the custody case in light of the father's pending bankruptcy action in federal court.

The father failed to give the child a birthday gift or otherwise acknowledge her birthday. In September 2020, when a hurricane struck Baldwin County, where the child lived, the father did not check on the child's safety, the mother said, and he failed to contact the child at Christmas 2020 or to give her presents. In fact, after July 2020, he did not attempt to contact the mother or the child again until he was served with the petition the mother filed in this action in July 2021, a year later. The mother testified that, when the father began disappearing from child's life for long periods, the child became confused and upset.

The mother denied that she had prevented the father from seeing or communicating with the child. However, when she filed the current petition to terminate the father's parental rights in July 2021, the mother

35

said, the father began sending text messages to her asking to see the child. At that time, she said, she told him to work through his attorney. She explained that she had wanted the father to visit the child in a regular, consistent manner so that the child would not be confused, but when the father had not seen the child in more than a year, she sought to terminate his parental rights.

The father testified that he had not seen the child since early 2020. He said that he made attempts to visit the child but that he "backed off and waited for [his] day in court."

A large part of the father's case was the introduction of pleadings and papers filed in the pending custody action that he was pursuing. The father's primary argument at trial was that the mother was using her current termination action to delay or to cut off the custody action, which had been pending since 2015. His attorney explained to the juvenile court that, instead of going forward with the custody action, where the court could consider the mother's contentions when it determined custody, the mother instead sought to terminate the father's parental rights so that he would be out of the child's life. To that end, he elicited testimony from the mother that she believed that the father was unfit and that she

wanted to go forward with terminating his parental rights regardless of the pending custody action.

On August 14, 2023, the juvenile court entered a judgment terminating the father's parental rights. The juvenile court found that clear and convincing evidence demonstrated that the father was unable or unwilling to discharge his responsibilities to and for the child and that his conduct or condition was unlikely to change in the foreseeable future. The juvenile court also found that all viable alternatives to terminating the father's parental rights had been exhausted. It then awarded custody of the child to the mother.

The father filed a motion to alter, amend, or vacate the judgment in which he argued that there had been a complete lack of evidence presented at trial that he had the intent to abandon the child. The juvenile court denied the postjudgment motion on August 28, 2023. The father filed a notice of appeal to this court.

The father contends that clear and convincing evidence does not support the trial court's determination that he abandoned the child or that his parental rights were due to be terminated. The juvenile court did not make an explicit finding of abandonment in this case; instead, it

found only that the father was unable or unwilling to carry out his duties and responsibilities for the child. However, the mother's petition to terminate the father's parental rights alleged that he had abandoned the child, and in their appellate briefs, both parties address the propriety of the juvenile court's judgment on the ground of abandonment.

"When a juvenile court has not made specific factual findings in support of its judgment, we must presume that the juvenile court made those findings necessary to support its judgment, provided that those findings are supported by the evidence." K.C. v. Jefferson Cnty. Dep't of Hum. Res., 54 So. 3d 407, 413 (Ala. Civ. App. 2010). Because the mother sought to terminate the father's parental rights on the ground of abandonment, which is one of the factors a juvenile court is to consider when determining whether the termination of one's parental rights is warranted, § 21-15-319(a)(1), Ala. Code 1975, we consider the propriety of the juvenile court's judgment based on the argument as framed by the parties, i.e., whether clear and convincing evidence supported a finding of abandonment.

When a custodial parent seeks to terminate the parental rights of the other parent, the juvenile court must first determine whether

grounds exist for the termination of those rights and then, if so, whether all viable alternatives to termination have been considered. J.C.L. v. J.B.L., 370 So. 3d 254, 263 (Ala. Civ. App. 2022). The father correctly states that, pursuant to § 12-15-319, Ala. Code 1975, a finding that a parent has abandoned a child must be based on clear and convincing evidence. "Clear and convincing evidence" is "'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'" L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002) (quoting § 6-11-20(b)(4), Ala. Code 1975). When a juvenile court is presented with evidence ore tenus, this court presumes that the juvenile court's factual findings are correct, see J.C. v. State Dep't of Hum. Res., 986 So. 2d 1172 (Ala. Civ. App. 2007), and we are bound by those findings if the record contains substantial evidence from which the juvenile court reasonably could have been clearly convinced of the fact sought to be proved, Ex parte McInish, 47 So. 3d 767 (Ala. 2008).

Section 12-15-319, which sets forth the circumstances under which a parent's parental rights may be terminated, reads, in pertinent part:

"(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parent[] of a child [is] unable or unwilling to discharge [his or her] responsibilities to and for the child, or that the conduct or condition of the parent[] renders [him or her] unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parent[]. ... In determining whether or not the parent[] [is] unable or unwilling to discharge [his or her] responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:

"(1) That the parent[] [has] abandoned the child, provided that in these cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parent[].

"....

"....

"(d) A rebuttable presumption that the parent[] [is] unable or unwilling to act as a parent[] exists in any case where the parent[] ha[s] abandoned a child and this abandonment continues for a period of four months next preceding the filing of the petition. ..."

Section 12-15-301(1), Ala. Code 1975, defines "abandonment" as

"[a] voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."

40

The father contends that his "vigorous litigation" of the custody action (which had been pending for six years when the mother filed the current termination action), as demonstrated by his numerous pleadings and requests to obtain parenting time, indicates that he had not voluntarily and intentionally relinquished custody of the child. He argues that his desire to establish parenting time through the judicial process "is a far cry from [the] mother's claim that [he] 'abandoned' the child and does not fit within the legislative definition of 'abandonment.'"

In support of his contention, the father relies on B.B. v. J.P., [CL-2022-1244, Aug. 11, 2023] ___ So. 3d ___ (Ala. Civ. App. 2023), in which this court reversed a juvenile court's judgment finding that the mother in that case had abandoned her children. In reaching our holding, we explained that the evidence "unequivocally established that the [custodial parent] exercised complete control over the mother's ability to visit with and to contact the children," that the mother had attempted to visit or contact the children on multiple occasions, and that the custodial parent had rebuffed her attempts. Id. Thus, we held, clear and convincing evidence did not support a determination that the mother had voluntarily abandoned the children. Id.

In this case, the father contends that the mother wanted the father's visits with the child to be on her terms, which, he appears to believe, justifies his failure to visit or communicate with the child for more than a year. B.B., which he uses to support his position, is readily distinguishable from this case. Here, the mother presented evidence indicating that, after the juvenile court denied her first attempt to terminate the father's parental rights on the ground of abandonment, rather than preventing the child from seeing the father, she worked with the father to help him build a relationship with the child by inviting him to dinner, asking him to go for walks with the child and her, and allowing the child to visit with his family. It is undisputed that the father failed to attempt to visit or to contact the child for more than a year. Evidence indicated that the father made no effort to acknowledge the child's birthday or to attempt to see her or communicate with her at Christmas. There is no evidence to show that he had attempted to provide the child with gifts on those occasions but that the mother prevented him from doing so. The mother testified that the father's conduct upset and confused the child, so it was only after the father attempted to renew

42

visitations with the child after his absence from the child's life for more than a year that she prevented him for having further visits.

Based on the evidence, the juvenile court could have been clearly convinced that the father initiated his withdrawal from the child's life. The father's reliance on wanting "his day in court" in the custody action to obtain visitation with the child or to be required to pay support for the child does not negate his voluntary disappearance from the child's life for more than a year, during which time he failed even to check on her safety when a hurricane struck Baldwin County, where the child lived. A pending custody case does not replace the father's intentional decision to refuse to maintain a relationship with a young child. To a child, a pending custody action cannot make up for missed visits, ignored holidays and birthdays, and an absence of the father from her life for at least a year.

The juvenile court could have been clearly convinced that the mother did not prevent the father from contacting the child, but, instead, that he made the decision not to do so voluntarily, intentionally, and unjustifiably. See C.C. v. L.J., 176 So. 3d 208, 211 (Ala. Civ. App. 2015) (holding that "a juvenile court may premise a finding of abandonment only upon evidence indicating that a parent voluntarily, intentionally,

and unjustifiably committed the actions or omissions set out in § 12-15-301, Ala. Code 1975"). Therefore, I would not reverse the judgment based on the father's first contention.

The father also contends that the mother failed to present clear and convincing evidence that all viable alternatives to the termination of his parental rights had been exhausted. However, "[i]t is well established that when a parent has abandoned a child, it is not necessary for a party seeking to terminate parental rights to demonstrate that there is no viable alternative to termination." J.C.L. v. J.B.L., 370 So. 3d 254, 263 (Ala. Civ. App. 2022). In other words, "once a parent has been found to have abandoned a child, the juvenile court is not required to consider whether a viable alternative to the termination of his or her parental rights exists." K.F. v. Millwood, [Ms. CL-2023-0393, Feb. 23, 2024] ___ So. 3d ___, ___ (Ala. Civ. App. 2024). This is so because, when a parent abandons his or her child, that parent loses any due-process rights that would have required the exploration of viable alternatives to the termination of his or her parental rights. C.C. v. L.J., 176 So. 3d at 217. Because clear and convincing evidence supported a finding that the father abandoned the child, the mother was not required to establish that

all viable alternatives to the termination of the father's parental rights were exhausted. Thus, I find no basis for reversing the juvenile court's judgment on the father's second contention.

\* \* \*

The father did not make in his initial brief the argument on which the main opinion relies to reverse the juvenile court's judgment. Moreover, there is no merit to the two arguments the father did make to this court in his initial brief. Because I would, on these bases, affirm the juvenile court's judgment, I respectfully dissent.

Hanson, J., concurs.